**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
Email: jpafiti@pomlaw.com
- *additional counsel on signature page* -

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY MARDER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>NIANTIC, INC., THE POKÉMON COMPANY, and NINTENDO CO. LTD.,<br><br>Defendants. | **Civil Action No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Marder ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants Niantic, Inc. ("Niantic"), The Pokémon Company ("Pokémon Co."), and Nintendo Co. Ltd. ("Nintendo") (collectively, "Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## PRELIMINARY STATEMENT

1. This is a class action against Defendants, arising from the popular *Pokémon Go* mobile game, developed by Niantic and based on a media franchise co-owned by Nintendo and marketed and licensed by Pokémon Co., with millions of players worldwide.

2. *Pokémon Go* is the latest iteration of the immensely popular Pokémon media franchise, which consists in large part of a series of video games in which players take on the role of "trainers" with the goal of capturing and collecting fantasy creatures called Pokémon. Released on July 6, 2016 in the United States, *Pokémon Go* is an "augmented reality" game in which players use their smart phones to "catch" Pokémon in the players' real-world surroundings by utilizing the GPS, camera, and gyroscope features on users' mobile devices. When a player comes in close proximity to GPS coordinates determined by a Niantic algorithm, the game uses the phone's camera mode and gyroscope to display the image of a Pokémon, superimposed over the real-world image displayed on the player's phone screen, as though the Pokémon existed in the real world. (*See* Figure 1.) By swiping their phone screens, players may then attempt to "catch" the Pokémon to add it to their virtual collections.



*Figure 1*

3. When the game detects, via GPS, that players are in the vicinity of certain real-world locations, the GPS coordinates of which were selected and programmed into the mobile application by Niantic and known to *Pokémon Go* players as "Pokéstops" and "Pokémon gyms," the players gain access to potentially vital in-game items, which they can use to catch Pokémon, among other purposes, or gain the opportunity to engage in virtual "battles" with other *Pokémon Go* players.

4. *Pokémon Go* was an immediate success. As of July 23, *Pokémon Go* had been downloaded more than 30 million times and had earned more than $35 million in revenue. According to Apple, Inc. ("Apple"), owner of the App Store (a digital distribution platform for mobile applications), *Pokémon Go* was downloaded more times in its first week than any other mobile application in history. At the time this complaint was filed, mobile users were spending more time playing *Pokémon Go* than using other popular applications such as Facebook and Twitter.

5. However, within days of the game's release, it became clear that a number of the GPS coordinates that Defendants had designated as Pokéstops and Pokémon gyms were, in fact, on or directly adjacent to private property, and that Defendants had placed these Pokéstops and Pokémon gyms ***without the consent of the properties' owners***.

6. Plaintiff discovered as much when, during the week of *Pokémon Go*'s release, strangers began lingering outside of his home with their phones in hand. At least five individuals knocked on Plaintiff's door and asked for access to Plaintiff's backyard in order to "catch" Pokémon that the game had placed at Plaintiff's residence in West Orange, New Jersey—***without*** Plaintiff's permission.

3

7. Plaintiff's situation is far from unique. Indeed, in the weeks following the release of *Pokémon Go*, it became apparent that Niantic had designated properties as Pokéstops and Pokémon gyms without seeking permission from property owners and with flagrant disregard for the foreseeable consequences of doing so. Shortly after the game's release, an individual whose Massachusetts home Niantic designated as a Pokémon gym reported more than 15 uninvited visitors in the space of only a few hours, and many more visitors over the following days. An Alabama cemetery complained that the presence of *Pokémon Go* players was detracting from the cemetery's decorum. Indeed, ***Niantic even placed three Pokéstops within the United States Holocaust Memorial Museum*** in Washington, D.C., prompting a complaint from the museum.

8. The intentional, unauthorized placement of Pokéstops and Pokémon gyms on or near the property of Plaintiff and other members of the proposed class constitutes a continuing invasion of the class members' use and enjoyment of their land, committed by Niantic on an ongoing basis for Defendants' profit. On the basis of the foregoing acts and practices, Defendant Niantic is liable for nuisance and all Defendants have been unjustly enriched.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000.00 and there is diversity between a plaintiff and a defendant.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Niantic is headquartered in this district and a substantial part of the events giving rise to the claim occurred within this district.

# PARTIES

11. Plaintiff Jeffrey Marder is a resident of West Orange, New Jersey. As described *supra* at ¶ 6, Defendant Niantic's placement of Pokémon on or near Plaintiff's property caused *Pokémon Go* players to interfere with Plaintiff's use and enjoyment of his property.

12. Defendant Niantic, Inc. is a software development company headquartered in San Francisco, California 94105. The company was formed in 2002 as Niantic Labs, an internal startup at Google Inc., and spun off as an independent entity in October 2015. Niantic is the developer and publisher of *Pokémon Go*. Niantic receives a percentage of all revenues generated by *Pokémon Go* mobile application.

13. Defendant The Pokémon Company is responsible for marketing and licensing the Pokémon franchise. Pokémon Co. is headquartered in Tokyo, Japan, and was established as a joint venture by Nintendo and the two other companies holding the copyright on Pokémon (Game Freak and Creatures). Defendant Nintendo holds a 32% ownership stake in Pokémon Co. Pokémon Co. receives a percentage of all revenues generated by the *Pokémon Go* mobile application.

14. Defendant Nintendo Co., Ltd. is a multinational consumer and electronics software company headquartered in Kyoto, Japan. Founded in 1889 as a playing card company, Nintendo entered the video game industry in the 1970s and today is the world's largest video game company by revenue. Nintendo is the publisher of the popular Pokémon video game series and, as described *supra* at ¶ 13, owns a 32% stake in Defendant Pokémon Co. Nintendo receives a percentage of all revenues generated by the *Pokémon Go* mobile application.

**SUBSTANTIVE ALLEGATIONS**

**Background**

15. Created in 1995 by the Japanese video game designer Satoshi Tajiri, the Pokémon media franchise consists in large part of video games centered on fictional creatures called Pokémon. A player's goal in Pokémon games is generally to capture as many Pokémon as possible—indeed, Pokémon's English language slogan is "Gotta Catch 'Em All"—and have the Pokémon battle one other for sport. Published by Nintendo, the Pokémon video games have sold more than 200 million copies worldwide.

*Pokémon Go*

16. On July 6, 2016, Niantic released *Pokémon Go*, the latest installment of the Pokémon video game series, as a mobile phone application in the United States. As with earlier Pokémon games, the object of *Pokémon Go* is to collect as many Pokémon as possible. Unlike previous Pokémon games, however, *Pokémon Go* took advantage of various mobile phone technologies—including GPS, camera, and gyroscope features—to create an "augmented reality" gaming experience, in which players discover and capture Pokémon by physically exploring their surroundings.

17. When a player comes in close proximity to GPS coordinates determined by a Niantic algorithm, the game uses the phone's camera mode and gyroscope to display the image of a Pokémon, superimposed over the real-world image displayed on the player's phone screen, as though the Pokémon existed in the real world. (*See* Figure 1.) By swiping their phone screens, players may then attempt to "catch" the Pokémon to add it to their virtual collections.

18. Additionally, Niantic selected and programmed into *Pokémon Go* the GPS coordinates of certain real world locations, designating them as "Pokéstops" and "Pokémon

6

gyms." At Pokéstops, players gain access to potentially vital in-game items, which they can use to catch Pokémon. In Pokémon gyms, players gain the opportunity to engage in virtual battles with other *Pokémon Go* players, success in which advances the player's progress through the game.

19. *Pokémon Go* was an immediate success and has been highly profitable for Defendants. As of July 23, 2016, *Pokémon Go* had been downloaded more than 30 million times and had earned more than $35 million in revenue. According to Apple, *Pokémon Go* was downloaded more times in its first week than any other mobile application in history. At the time this complaint was filed, mobile users were spending more time playing *Pokémon Go* than using other popular applications such as Facebook and Twitter.

### Placement of Pokéstops and Pokémon Gyms on Private Property

20. Within days of the game's release, it became clear that a number of the GPS coordinates that Defendants had designated as Pokéstops and Pokémon gyms were, in fact, on or near private property, and that Defendants had placed these Pokéstops and Pokémon gyms *without the consent of the properties' owners*.

21. In the days following the U.S. release of *Pokémon Go*, Plaintiff became aware that strangers were gathering outside of his home, holding up their mobile phones as if they were taking pictures. At least five individuals knocked on Plaintiff's door, informed Plaintiff that there was a Pokémon in his backyard, and asked for access to Plaintiff's backyard in order to "catch" the Pokémon.

22. Plaintiff's experience is not unique. In a series of tweets on July 9, 2016, Boon Sheridan, a resident of Holyoke, Massachusetts, reported that Niantic had placed a Pokémon gym in his home. (*See Figure* 2.)



*Figure 2*

23. By mid-afternoon that day, Sheridan reported that "I've counted 15 people stopping by and lingering in their phones so far. I think at least three car visits as well." (*See Figure* 3.)

*Figure 3*

24. In an interview with the online publication *Buzzfeed*, Sheridan "said it is a little odd that **he has no control over his home being a significant part of the game, and never signed off on being included**." (Emphases added.)

25. Likewise, as reported in the online videogame publication *Gamerant*, Niantic placed a Pokéstop at a private residence in Albuquerque, New Mexico, already famous as a filming location for the television show *Breaking Bad*. *Gamerant's* article stated, in part, that the home's "yard is being besieged by intrepid *Pokémon Go* trainers who may not be aware they're stepping onto private property."

26. Indeed, Defendants have shown a flagrant disregard for the foreseeable consequences of populating the real world with virtual Pokémon without seeking the permission of property owners. Niantic placed **at least three Pokéstops within the United States Holocaust Memorial Museum** in Washington, D.C. (*see* Figure 4), prompting the museum to state that

"Playing the game is not appropriate in the museum, which is a memorial to the victims of Nazism. We are trying to find out if we can get the museum excluded from the game." Similarly, a representative of Mobile Memorial Gardens, a cemetery in Mobile, Alabama, has objected to the presence of *Pokémon Go* players on its property, stating "This is private. I owe it to the families we serve to provide a sense of decorum here."



*Figure 4*

27.     Niantic blithely acknowledges its placement of Pokéstops on private property, advising users on the *Pokémon Go* website: "If you can't get to the Pokéstop because it's on private property, there will be more just around the corner, so don't worry!"[1]  (*See Figure* 5.)

---

[1] https://www.nianticlabs.com/terms/pokemongo/en, accessed on July 22, 2016.

*Figure 5*

28. *Pokémon Go* has been immensely profitable for the Defendants, each of which receives a percentage of revenues generated by the game. The game's profitability derives from its popularity, which, in turn, derives in large part from its innovative augmented reality experience, in which playing *Pokémon Go* turns a user's surroundings into a virtual world of beacons to be activated and Pokémon to be captured.

29. To create that immersive world, Niantic made unauthorized use of Plaintiff's and other Class members' property by placing Pokéstops and Pokémon gyms thereupon or nearby. In so doing, Niantic has encouraged *Pokémon Go*'s millions of players to make unwanted incursions onto the properties of Plaintiff and other members of the class—a clear and ongoing invasion of their use and enjoyment of their land from which Defendants have profited and continue to profit.

## **CLASS ACTION ALLEGATIONS**

30. Plaintiff brings this lawsuit as a class action on behalf of himself and all other similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

31. The proposed nationwide class (the "Class") Plaintiff seeks to represent is defined as follows:

All persons in the United States who own property (i) the GPS coordinates of which were designated by Defendants, without authorization, as Pokéstops or Pokémon gyms in the *Pokémon Go* mobile application <u>or</u> (ii) abutting property the GPS coordinates of which were designated by Defendants, without authorization, as Pokéstops or Pokémon gyms in the *Pokémon Go* mobile application.

32.  Excluded from the Class are the Defendants; any entity or division in which they have a controlling interest; their legal representatives, officers, directors, assignees, and successors; and their current or former employees. Plaintiff reserves the right to amend the Class definitions and to add additional sub-Classes as appropriate if discovery and further investigation reveal that the Class should be expanded, otherwise divided into sub-Class, or modified in any other way.

### Numerosity & Ascertainability

33.  Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.

34.  The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Defendants' possession, custody, or control.

### Typicality

35.  Plaintiff's claims are typical of the claims of Class, as Plaintiff and the other members of the Class sustained damages arising out of the same wrongful conduct by Defendants, as alleged herein.

**Adequate Representation**

36.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation nationwide.

37.     Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Predominance of Common Issues**

38.     There are numerous questions of law and fact common to Plaintiff and Class members that predominate over any question affecting only individual Class members, the answer to which will advance resolution of the litigation as to all Class members. These common legal and factual issues include, *inter alia*:

- a. whether Defendants designated GPS coordinates located on private property as Pokéstops or Pokémon gyms;
- b. whether Defendants' conduct constituted a trespass and/or nuisance at common law and if so, what remedies are available by law;
- c. whether Defendants were unjustly enriched by their actions as alleged herein;
- d. whether the Court should enjoin Defendants from continuing to engage in the conduct complained of herein;
- e. the appropriate measure of relief, including, but not limited to, a preliminary and/or permanent injunction; and
- f. the extent of the damages caused by Defendants' acts.

**Superiority**

35. Plaintiff and other Class members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

36. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that few if any Class members could afford to seek legal redress for Defendants' misconduct as alleged herein. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without remedy.

37. Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class action treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**COUNT I**
**(Nuisance)**

**(Brought on Behalf of Plaintiff and the Class against Niantic)**

38. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

39. At common law, an invasion of one's use and enjoyment of their land, if repeated or of long duration, constitutes a nuisance.

40. As described above, via designation of specific GPS coordinates, Niantic intentionally placed virtual Pokéstops and Pokémon gyms on or near the properties of Plaintiff and other members of the proposed Class.

41. Niantic undertook the foregoing conduct without authorization from Plaintiff or other members of the proposed Class.

42. The foregoing conduct has resulted in foreseeable incursions by *Pokémon Go* players onto the property of Plaintiff and the other members of the proposed Class, thereby invading their use and enjoyment of their properties.

43. The invasion described above remains ongoing, as at the time of the filing of this Complaint, Niantic continued to designate GPS coordinates on or near the properties of Plaintiff and other members of the proposed Class as Pokéstops and Pokémon gyms in *Pokémon Go*.

44. The foregoing conduct constitutes a nuisance.

45. As a direct and proximate result of Niantic's actions, Niantic is liable to Plaintiff and the other members of the proposed Class.

**COUNT II**
**(Unjust Enrichment)**

**(Brought on Behalf of the Plaintiff and the Class against all Defendants)**

46. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

47. Defendants have received and retained a benefit from Plaintiff and other members of the proposed Class, resulting in inequity.

48. By designating GPS coordinates on or near the properties of Plaintiff and other members of the proposed Class as Pokéstops and Pokémon gyms in the *Pokémon Go* game, Defendants created a more immersive gaming experience, thereby increasing the game's

popularity and profitability, while encouraging millions of *Pokémon Go* players to make incursions onto the properties of Plaintiff and other members of the proposed Class.

49. As described *supra* at ¶¶ 12-14, each of the Defendants receives a percentage of all revenues generated by *Pokémon Go*.

50. As a result of the foregoing conduct, Defendants have been unjustly enriched.

51. The amount of Defendants' unjust enrichment should be disgorged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiff as the Class representative;

B. Awarding Plaintiff and the other members of the Class damages, disgorgement or other monetary or equitable relief provided by and pursuant to the common law claims cited above or as the Court deems just proper;

C. Enjoining Defendants from continuing the wrongful acts and practices alleged;

D. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest;

E. Awarding Plaintiff and the other members of the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

F. Awarding such other and further relief as this Court may deem just and proper.

# JURY DEMAND

Plaintiff demands trial by jury.

Dated: July 29, 2016

        Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
      ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*