**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:     (212) 661-1100
Fax:     (917) 463-1044
Email: mjsteven@pomlaw.com
          aiqbal@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Tel: (818) 532-6499
Email: jpafiti@pomlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE POKÉMON GO NUISANCE LITIGATION | Case No. 3:16-cv-04300-JD <br><br> **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

{00251931;4 }

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

JURISDICTION AND VENUE ...............................................................................4

PARTIES ..................................................................................................................4

SUBSTANTIVE ALLEGATIONS ..........................................................................6

    Background ...........................................................................................................6

    *Pokémon Go* and Augmented Reality...................................................................7

    *Pokémon Go* Is Fundamentally a Scavenger Hunt—a Social Experience With
    Simple, Accessible Gameplay That Draws Its Appeal from Real-World Travel............9

    Monetizing Augmented Reality and Externalizing Its Costs.........................................13

    Placement of Pokéstops and Pokémon Gyms On or Near Private Property...................15

    Jeffrey Marder ....................................................................................................15

    The Villas of Positano .......................................................................................16

    Scott and Jayme-Gotts Dodich..........................................................................17

    Jill M. Barbarise................................................................................................23

    Jason Sarkis .......................................................................................................24

    Melissa Perez .....................................................................................................26

    "Sam" Congshan Hao .........................................................................................27

    Bruce Garton ......................................................................................................28

    Sally Rogers .......................................................................................................29

    Deborah J. Pimentel ..........................................................................................32

    Loren Morgan ....................................................................................................34

    Many Other Examples ........................................................................................34

    Without Being Able to Exploit The Private Property Of Others,
    Niantic's Business Model Would Be Severely Weakened .............................................39

    The Requested Injunction Would Cost Niantic At Least $5 Million.............................43

CLASS ACTION ALLEGATIONS ........................................................................44

    Numerosity & Ascertainability ..........................................................................45

    Typicality ...........................................................................................................45

    Adequate Representation ....................................................................................46

    Predominance of Common Issues ......................................................................46

    Superiority..........................................................................................................46

COUNT I ................................................................................................................47

COUNT II ...................................................................................................................................48

PRAYER FOR RELIEF .............................................................................................................49

JURY DEMAND .........................................................................................................................49

Plaintiffs Jeffrey Marder; Scott Dodich and Jayme Gotts-Dodich (the "Dodichs"); The Villas of Positano Condominium Association, Inc., on behalf of its members; Jill M. Barbarise; Jason Sarkis; Melissa Perez; "Sam" Congshan Hao; Bruce Garton; Sally Rogers; Deborah J. Pimentel; and Loren Morgan (collectively, "Plaintiffs"), by their undersigned attorneys, for their second consolidated amended complaint against Defendant Niantic, Inc. ("Niantic"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **PRELIMINARY STATEMENT**

1.      This is a class action against Niantic, arising from the popular *Pokémon Go* mobile game, developed by Niantic and based on a media franchise co-owned by Nintendo Co. Ltd. ("Nintendo") and marketed and licensed by The Pokémon Company ("Pokémon Co.")[1], with millions of players worldwide.

2.      *Pokémon Go* is the latest iteration of the immensely popular Pokémon media franchise, which consists in large part of a series of video games in which players take on the roles of "trainers" with the goal of capturing and collecting fantasy creatures called Pokémon. Released on July 6, 2016 in the United States, *Pokémon Go* is an "augmented reality" game in which players use their smart phones to "catch" Pokémon in the players' real-world surroundings by utilizing the GPS, camera, and gyroscope features on users' mobile devices. When a player comes in close proximity to GPS coordinates determined by a Niantic algorithm, the game uses the phone's camera mode and gyroscope to display the image of a Pokémon, superimposed over the real-world image displayed on the player's phone screen, as though the

---

[1] Pokémon Co. has separate divisions and/or subsidiaries that handle operations in different areas of the world. Its subsidiary The Pokémon Company International is responsible for North America and most territories outside Asia.

1    Pokémon existed in the real world. (*See* Figure 1.) By swiping their phone screens, players may

2    then attempt to "catch" the Pokémon to add it to their virtual collections.



*Figure 1*

3.      When the game detects, via GPS, that players are in the vicinity of certain real-world locations, the GPS coordinates of which were selected and programmed into the mobile application by Niantic and known to *Pokémon Go* players as "Pokéstops" and "Pokémon gyms," the players gain access to potentially vital in-game items, which they can use to catch Pokémon, among other purposes, or gain the opportunity to engage in virtual "battles" with other *Pokémon Go* players.

4.      *Pokémon Go* was an immediate success. On Apple's App Store, the *Pokémon Go* iTunes app was downloaded more times in its first week than any other iTunes app in history. In the first three weeks of its release, *Pokémon Go* was downloaded more than 30 million times and earned more than $35 million in revenue. *Pokémon Go* user engagement quickly surpassed that of other popular applications such as Facebook and Twitter.

5.      However, it quickly became clear that in releasing *Pokémon Go*, Niantic had flagrantly disregarded the foreseeable consequences of its game, an innovative, augmented reality experience that blurs the line between the "virtual" and "real" worlds in unprecedented ways. A number of the GPS coordinates that Niantic had designated as Pokéstops and Pokémon

gyms were, in fact, on or directly adjacent to private property, and Niantic placed these Pokéstops and Pokémon gyms *without the consent of the properties' owners*. Shortly after the game's release, an individual whose Massachusetts home Niantic designated as a Pokémon gym reported more than 15 uninvited visitors in the space of only a few hours, and many more visitors over the following days. An Alabama cemetery complained that the presence of *Pokémon Go* players was detracting from the cemetery's decorum. Indeed, *Niantic even placed three Pokéstops within the United States Holocaust Memorial Museum* in Washington, D.C., prompting a complaint from the museum.

6.   The nature of the augmented reality experience at the heart of *Pokémon Go* is such that the appeal of the game has little to do with any gameplay elements in the app itself. In fact, the gameplay itself is simple and repetitive by design, because this makes the game accessible enough to go viral. Rather, the primary appeal of *Pokémon Go* is the need for real-world travel and the social engagement inherent in large groups of players congregating in close physical proximity.

7.   Niantic understands this; indeed, it is the key to *Pokémon Go's* runaway success. However, while Niantic has been quick to recognize opportunities to monetize this interplay, netting it significant profits from players' participation in *Pokémon Go's* virtual, in-game economy, it has so far refused to bear the real-world costs that the game has created for the affected property owners.

8.   Niantic's unauthorized placement of Pokéstops and Pokémon gyms on or near the property of Plaintiffs and other members of the proposed class constitutes an intentional entry of their properties. The continuing invasion of the class members' use and enjoyment of their properties, committed by Niantic on an ongoing basis for profit, has caused significant harm to the members of the proposed class. On the basis of the foregoing acts and practices, Niantic is liable for trespass and nuisance.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there is diversity between a plaintiff and a defendant and the aggregate amount in controversy exceeds $5,000,000.00. *See infra* ¶¶153–155.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Niantic is headquartered in this district and a substantial part of the events giving rise to the claim occurred within this district.

## PARTIES

11.     Plaintiff Jeffrey Marder is a resident of West Orange, New Jersey. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Mr. Marder's property interfered with his use and enjoyment of his property and caused significant harm to Mr. Marder.

12.     Plaintiffs Scott Dodich and Jayme Gotts-Dodich are residents of St. Clair Shores, Michigan. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on and near the Dodichs' property interfered with their use and enjoyment of their property and caused significant harm to the Dodichs.

13.     Plaintiff The Villas of Positano Condominium Association, Inc. is a non-profit corporation incorporated in the State of Florida. The Condominium Association's membership is comprised of the owners of the Villas of Positano (the "Villas") condominiums, located in Hollywood, Florida. The Condominium Association collects the periodic association fees that each owner pays for the Villas' facilities, insurance, and community maintenance. The Condominium Association governs the policies of the Villas of Positano, and is responsible for, *inter alia*, the Villas' maintenance. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms at or near the Villas of Positano interfered with the Condominium Association's members' use and enjoyment of their properties and caused

significant harm to the Condominium Association's members. As such, the Condominium Association has standing to bring this action on its members' behalf, because: (a) the Condominium Association's members would otherwise have standing to sue in their own right; (b) the interests the Condominium Association seeks to protect are germane to its organizational purpose; and (c) neither the claims asserted nor the relief requested herein requires the participation of individual members in this litigation.

14.     Plaintiff Jill M. Barbarise is a resident of Oradell, New Jersey. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Ms. Barbarise's property interfered with her use and enjoyment of her property and caused significant harm to Ms. Barbarise.

15.     Plaintiff Jason Sarkis is a resident of Webster, New York. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Mr. Sarkis's property interfered with his use and enjoyment of his property and caused significant harm to Mr. Sarkis.

16.     Plaintiff Melissa Perez is a resident of Pulare, California. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Ms. Perez's property interfered with her use and enjoyment of her property and caused significant harm to Ms. Perez.

17.     Plaintiff "Sam" Congshan Hao is a resident of Elmhurst, New York. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Mr. Hao's property interfered with his use and enjoyment of his property and caused significant harm to Mr. Hao.

18.     Plaintiff Bruce Garton is a resident of Nashville, Tennessee. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Mr. Garton's property interfered with his use and enjoyment of his property and caused significant harm to Mr. Garton.

19.     Plaintiff Sally Rogers is a resident of Tesuque, New Mexico. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or

near Ms. Rogers's property interfered with her use and enjoyment of her property and caused significant harm to Ms. Rogers.

20.     Plaintiff Deborah J. Pimentel is a resident of Pleasant Grove, Utah. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Ms. Pimentel's property interfered with her use and enjoyment of her property and caused significant harm to Ms. Pimentel.

21.     Plaintiff Loren Morgan is a resident of Gahanna, Ohio. As described herein, Defendant Niantic's placement of Pokémon, Pokéstops and/or Pokémon Gyms on or near Mr. Morgan's property interfered with his use and enjoyment of his property and caused significant harm to Mr. Morgan.

22.     Defendant Niantic, Inc. is a software development company headquartered in San Francisco, California 94105. The company was formed in 2002 as Niantic Labs, an internal startup at Google Inc., and spun off as an independent entity in October 2015. Niantic is the developer and publisher of *Pokémon Go*. Niantic receives a percentage of all revenues generated by the *Pokémon Go* mobile application.

# SUBSTANTIVE ALLEGATIONS

## Background

23.     Created in 1995 by the Japanese video game designer Satoshi Tajiri, the Pokémon media franchise consists primarily of video games centered on fictional creatures called "Pokémon" (short for "pocket monsters"). People playing the game are "Pokémon trainers," and they travel around the world with the goal of capturing as many Pokémon as possible (indeed, Pokémon's English language slogan is "Gotta Catch 'Em All"), training and strengthening them, and then engaging in battles against teams owned by other trainers.

24.     The Pokémon media franchise now spans video games, trading card games, animated television shows and movies, comic books, and toys. It is the highest-grossing media

franchise of all time, and the second best-selling video game franchise of all time. The Pokémon video games have sold more than 290 million copies worldwide.

### *Pokémon Go* and Augmented Reality

25.     On July 6, 2016, Niantic released *Pokémon Go*, the latest installment of the Pokémon video game series, as a mobile phone application in the United States. As with earlier Pokémon games, the object of *Pokémon Go* is to collect as many Pokémon as possible. Unlike previous Pokémon games, however, *Pokémon Go* took advantage of various mobile phone technologies—including GPS, camera, and gyroscope features—to create an "augmented reality" gaming experience, in which players discover and capture Pokémon by physically exploring their surroundings.

26.     Augmented reality requires a live view of the physical world—for instance, through a mobile phone camera display—elements of which are augmented by computer-generated sensory input such as sound, video, graphics, or GPS data. From a development perspective, the physical world is thus the backdrop against which an augmented reality experience is rendered, and from a user's perspective, the physical world is the landscape against which an augmented reality experience unfolds.

27.     As an augmented reality game, *Pokémon Go* is dependent in equal parts on both Defendant Niantic's software code and on the existence of a physical space for its players to explore. To create the world of *Pokémon Go*, Niantic used mapping software to create a stylized, three-dimensional map of a player's actual surroundings—in essence, using the real world and the countless public and private properties that constitute it as building blocks for the game. (*See Figure* 2.) As a *Pokémon Go* player physically moves throughout the real world, the player's avatar correspondingly moves throughout the map displayed on the player's phone.



*Figure 2*

28.     Niantic has placed different types of Pokémon at different locations on its game map. When the player's phone detects that the player is close enough to the real-world GPS coordinates of one of these locations, the game activates the phone's camera and superimposes an image of the Pokémon over the camera feed, making it seem as if the Pokémon is right in front of the player. (*See* Figure 1.) By swiping their phone screens, players can try to "catch" the Pokémon and add it to their virtual collection.

29.     There are hundreds of different types of Pokémon available for capture, and the most prominent goal in the game is to "catch them all."[2] Different types spawn at different times and places: grass-type Pokémon are more common in parks, whereas water-type Pokémon are more common near lakes and rivers—in fact, many players have even concluded that certain Pokémon are nocturnal and thus spawn primarily at night.[3] Some are common, appearing frequently across a wide range of GPS coordinates and times of day, whereas others are very

---

[2] Upon the launch of *Pokémon Go*, there were approximately 151 different Pokémon available for capture. Around February 16, 2017, Niantic added approximately 100 more. Niantic will likely continue to add more over time.

[3] *See, e.g.*, *Are There Nocturnal Pokemon In Pokemon GO? New Research Finds Some Pokemon More Common At Night* (Mar. 8, 2017), *Pokemon Go* Informer, https://pokemongoinformer.com/nocturnal-pokemon-in-pokemon-go/.

rare, spawning only at certain times and in a narrow range of locations. Players can also obtain Pokémon eggs, which hatch only after the player has travelled several kilometers while playing the game.

30. Niantic also selects and designates certain real-world locations as "Pokéstops" and "Pokémon gyms," both of which are essential for players to advance in the game. By visiting Pokéstops, players can obtain valuable items that help find, catch, and upgrade their Pokémon. At Pokémon gyms, players can engage in virtual battles with other players, with the ultimate goal of taking control of the gym. At higher levels of the game, gaining control of many different gyms is one of the fastest ways to advance in the game.

31. Because each Pokéstop or Pokémon gym exists only at a specific set of GPS coordinates, a *Pokémon Go* player must be in the physical vicinity of the real-world property associated with those GPS coordinates to take advantage of them and reap the associated in-game reward. In particular, to engage in a battle at a Pokémon Gym, a player must not only travel to the vicinity of a Pokémon Gym but must also remain within some minimum distance from the gym for the duration of the battle.[4]

32. Thus, the most effective way to advance quickly in the game is to travel and explore widely, visiting a variety of places at different times of day and night, in order to capture as many different Pokémon as possible and to take advantage of Pokéstops and Pokémon gyms.

### *Pokémon Go* Is Fundamentally a Scavenger Hunt—a Social Experience With Simple, Accessible Gameplay That Draws Its Appeal from Real-World Travel

33. Fundamentally, the appeal of *Pokémon Go* has had little to do with gameplay elements programmed into the app itself. Rather, the primary appeal of *Pokémon Go* is that it is a *social* experience unfolding in *real, physical space*.

---

[4] Ripsuibunny, *Gym battle distance checks - be within 100m*, Reddit, https://www.reddit.com/r/TheSilphRoad/comments/6nn2mb/gym_battle_distance_checks_be_within_100m/ (July 16, 2017).

34.    Niantic emphasizes this heavily in its advertising, encouraging players to search far and wide to capture Pokémon and advance in the game. For example: Niantic's description of the game on Apple's and Google's application stores heavily promotes this aspect of *Pokémon Go*:

> Venusaur, Charizard, Blastoise, Pikachu, and many other Pokémon have been discovered!
>
> Now's your chance to ***discover and capture the Pokémon all around you—so get your shoes on, step outside, and explore the world***. You'll join one of three teams and battle for the ownership of Gyms with your Pokémon at your side.
>
> Pokémon are out there, and you need to find them. ***As you walk around a neighborhood, your smartphone will vibrate when there's a Pokémon nearby***. Take aim and throw a Poké Ball… You'll have to stay alert, or it might get away!
>
> ***Search far and wide for Pokémon and items***
>
> ***Certain Pokémon appear near their native environment—look for Water-type Pokémon by lakes and oceans. Visit PokéStops and Gyms—found at interesting places like museums, art installations, historical markers, and monuments***—to stock up on Poké Balls and helpful items.
>
> * * *
>
> Take on Gym battles and defend your Gym
>
> As your Charmander evolves to Charmeleon and then Charizard, you can battle together to defeat a Gym and assign your Pokémon to defend it against all comers. You can also participate in Raid Battles at Gyms around the world. A Raid Battle is a cooperative gameplay experience that encourages you to work with up to 20 other Trainers to defeat an extremely powerful Pokémon known as the Raid Boss. If you succeed in defeating it in battle, you'll have the chance to catch an extra powerful Pokémon of your own!
>
> ***It's time to get moving***—your real-life adventures await![5]

---

[5] Niantic, Inc., *Pokémon Go*, iTunes, https://itunes.apple.com/us/app/pok%C3%A9mon-go/id1094591345?mt=8 (last visited Aug. 28, 2017) (emphases added); Niantic, Inc., *Pokémon*

35.     Niantic also consistently reiterates the importance of real-world social engagement in its public communications. For example, a recent blog post emphasized that "Our games are designed to inspire movement, face-to-face social interactions, and exploration of public spaces."[6]

36.     Many commentators have also noted the centrality of real-world travel to the game. For example:

> *[T]he game does a lot to make you explore your real-world environment at different times*. For example, if you go out to a park, you'll probably see more grass- or bug-type Pokémon. If you go near a lake or ocean, you'll be able to pick up more water types. And if you go out at night, you'll see more nocturnal fairy and ghost types.
>
> This is further enhanced by PokéStops, which are essentially notable locations in the real world marked on your in-game map. You can go to these to nab items, including Poké Balls and eggs that can hatch into full Pokémon. It's also possible to install special items at PokéStops that lure extra Pokémon, which also make the stops glow pink on the map so players know that hanging around will attract extra Pokémon.
>
> *This need to travel is the game's depth*, essentially: To catch them all (and earn the medals attached to catching Pokémon), *you're going to have to explore far and wide, during the day and night* — like Ash Ketchum does in the TV show. It's the only way to become the very best, like no one ever was.
>
> *The game monetizes on this, too:* You can buy items in the store with real money that help you lure Pokémon. Since *Pokémon Go* is free to download and play, this is how the developers are making money off the game. (They'll also probably make money off all the data they're collecting.)[7]

---

*Go*, Google Play, https://play.google.com/store/apps/details?id=com.nianticlabs.pokemongo&hl=en (last visited Aug. 28, 2017) (emphases added).

[6] *Fostering Community Engagement with Augmented Reality*, Niantic Labs, June 30, 2017, https://www.nianticlabs.com/blog/communityevents/.

[7] German Lopez, *Pokémon Go, explained*, Vox, Aug. 5, 2016, https://www.vox.com/2016/7/11/12129162/pokemon-go-android-ios-game.

37.     The centrality of real-world travel is heightened by the relative lack of other gameplay elements. Catching Pokémon is highly repetitive, consisting overwhelmingly of making the same swiping motion over and over (albeit with slightly more precision as the player advances). The gym battles in *Pokémon Go* are determined primarily by the player's Pokémon's "combat power" statistic—involving little of the strategy that made battles interesting in previous Pokémon games. As many commentators have noted, these are "mostly boring and mundane grindy activities that offer little to no reward in terms of player progression and satisfaction."[8]

38.     One result is that the "most powerful wellspring of fun in the game's design is how it ***cultivates social engagement***."[9] Players have to travel to the same physical location to access a Pokéstop or Pokémon Gym, and it's easy to identify other players because "collecting Pokémon is a distinctive-looking thing to do with a phone. ***Players can tell when a stranger is collecting Pokémon at a place they happen to be***."[10]

39.     Essentially, Niantic has created and now manages and operates a scavenger hunt. To play the game, players must travel to specific physical locations where they can find items (Pokémon, Pokéstops, and Pokémon gyms) that are necessary to advance in the game. These items are only accessible to players in their immediate physical proximity—and Niantic has complete control over the locations of these in-game items. Moreover, like a scavenger hunt, *Pokémon Go* incentivizes players to go and to congregate in large groups in places where they would otherwise have no reason to go. As a result, every day, Niantic sends thousands and sometimes millions of players searching for Pokémon and other items that Niantic has placed at specific GPS coordinates.

---

[8] *Pokemon GO Lack of Content is becoming Evident* (Sep. 21, 2016), *Pokemon GO* Hub, https://pokemongohub.net/post/featured/pokemon-go-lack-of-content/.

[9] *Why Pokemon Go became an instant phenomenon* (July 15, 2016, 3:57 pm), The Conversation, https://theconversation.com/why-pokemon-go-became-an-instant-phenomenon-62412.

[10] *Id.*

40.     All of this means that a big part of the game's appeal inherently requires **large groups of players congregating in close physical proximity**—just like most sports and many other recreational activities. This requires physical space, and it creates significant logistical challenges that *someone* has to be responsible for, such as cleaning and maintaining the physical space, providing bathroom and other facilities, and so forth.

## Monetizing Augmented Reality and Externalizing Its Costs

41.     The core innovation of *Pokémon Go* is that it has enabled Niantic to profit handsomely from a game that is fundamentally about exploring physical space, without having to pay for that physical space or for any of the foreseeable costs of maintaining that physical space.

42.     Initially, Niantic's primary revenue source from *Pokémon Go* was by selling PokéCoins, the game's virtual currency. While a player may earn PokéCoins simply by playing *Pokémon Go*, the fastest and easiest way to earn PokéCoins—and thus the fastest and easiest way to upgrade one's *Pokémon Go* inventory—is to purchase PokéCoins with real money. A *Pokémon Go* player can pay anywhere from $0.99 for 100 PokéCoins to $99.99 for 14,500 PokéCoins.

43.     In July 2016, Niantic was generating $1.6 million per day from iPhone users alone, and approximately $200 million in total during the game's first month on the market.[11] By August 2016, *Pokémon Go* had 100 million monthly users worldwide. The game's total revenues for 2016 were $950 million. By May 2017, *Pokémon Go* players had walked more than 15.8 billion kilometers while playing the game.

---

[11] Alice Truong, *Pokémon Go is making $1.6 million each day in the US from iOS users paying for silly virtual goods*, QZ, July 12, 2016, https://qz.com/729935/pokemon-go-is-making-1-6-million-each-day-in-the-us-from-ios-users-paying-for-silly-virtual-goods/; Mike Minotti, *Sensor Tower: Pokémon Go made $200 million in its first month*, VentureBeat (Aug. 8, 2016 9:20 AM), https://venturebeat.com/2016/08/08/sensor-tower-pokemon-go-made-200-million-in-its-first-month/.

44.     Commentators noted that the game's revenues were attributable to "the game's beloved intellectual property, simple mechanics, real-world augmented reality gameplay, and perhaps most of all, its social nature."[12]

45.     More recently, Niantic has introduced "Raid Battles," which can only be accessed with a "Raid Pass," which are available for free in limited quantities—but a "Premium Raid Pass," which is far more valuable, must be purchased. This has become another major revenue stream.

46.     In June 2017, the game had 60 million monthly players, with 20 percent of them opening the game at least once a day. As of June 30, 2017, *Pokémon Go* had been downloaded 752 million times and had generated $1.2 billion in revenue.[13] As of July 11, 2017, *Pokémon Go* players in the United States had spent $424 million on in-app purchases in the Apple App Store and Google Play store combined.[14]

47.     But as noted above, the game inherently requires large groups of players congregating in close physical proximity, which creates obvious foreseeable costs and expenses and logistical challenges. In launching *Pokémon Go*, however, Niantic considered the physical footprints of its game only to the extent they could be monetized for its benefit, while flagrantly disregarding the foreseeable consequences of the game for property owners.

48.     To create the world of *Pokémon Go*, Niantic used real properties, owned by real persons, as building blocks to construct a simulacrum of reality. For a player's avatar to explore

---

[12] Dean Takahashi, *Pokémon Go generated revenues of $950 million in 2016*, VentureBeat (Jan. 17, 2017, 12:02 a.m.), https://venturebeat.com/2017/01/17/Pokemon-go-generated-revenues-of-950-million-in-2016/.

[13] Mike Minotti, *Pokémon Go passes $1.2 billion in revenue and 752 million downloads*, VentureBeat (June 30, 2017, 2:30 p.m.), https://venturebeat.com/2017/06/30/Pokemon-go-passes-1-2-billion-in-revenue-and-752-million-downloads/ ; *Adventures Await!*, *Pokemon Go* (May 16, 2017), http://pokemongolive.com/en/post/adventureweek2017.

[14] Stephanie Chan, *Sensor Tower: Pokémon Go's Japanese players outspend the U.S. nearly 4-to-1*, VentureBeat (July 11, 2017 2:30 p.m.), https://venturebeat.com/2017/07/11/sensor-tower-Pokémon-gos-japanese-players-outspend-the-u-s-nearly-4-to-1/.

the world of *Pokémon Go*, that player must physically move about in and to certain locations in the physical world. Niantic incentivizes players to go to certain real-world locations by placing rare Pokémon, Pokémon Gyms, and/or Pokéstops at those locations. Those locations thus become popular destinations for *Pokémon Go* players to congregate.

49.     By concentrating a significant number of Pokémon Gyms and Pokéstops in a small public park on a quiet residential block, for example, Niantic ensured that the park would remain full of *Pokémon Go* players making in-game purchases, thereby creating a robust revenue stream from that location. Yet with respect to the costs associated with the physical presence of so many *Pokémon Go* players in one place—of providing parking or other resources for more visitors than the park was ever intended to accommodate, for example, or preventing or paying for the foreseeable damage to residential property when a quiet residential street suddenly experiences an exponential increase in visitors—Niantic has disclaimed all responsibility, imposing it instead on members of the Class. To date, Niantic has reaped significant profits from the in-game economy of *Pokémon Go*, while externalizing the game's costs to the real world, to be borne by real people.

### Placement of Pokéstops and Pokémon Gyms On or Near Private Property

50.     Within days of the game's release, it became clear that many Pokéstops and Pokémon gyms were, in fact, on or near private property, and that Niantic had placed these Pokéstops and Pokémon gyms ***without the consent of the properties' owners***.

### Jeffrey Marder

51.     In early July 2016, shortly after the release of *Pokémon Go*, Plaintiff Jeffrey Marder became aware that strangers were gathering outside of his home, holding up their mobile phones as if they were taking pictures. At least five individuals knocked on Mr. Marder's door, informed Mr. Marder that there was a Pokémon in his backyard, and asked for access to his backyard in order to "catch" the Pokémon.

**The Villas of Positano**

52.     Likewise, residents of the Villas of Positano—an oceanfront condominium complex consisting of 62 private residences, located in Hollywood, Florida—became aware of hundreds of non-residents infiltrating their private condominium complex during the early hours of the morning, behaving "like zombies, walking around bumping into things." Villas residents subsequently discovered that Defendant Niantic had designated the Villas as a Pokéstop, labeled "Greek Architect" (an apparent reference to the Villas' Mediterranean-influenced aesthetic). (*See* Figure 3.) Moreover, Niantic had also programmed the *Pokémon Go* game to spawn certain rare Pokémon at the Villas, late at night and during early morning hours.

 

*Figure 3*

53.     Over the next several weeks, conditions deteriorated at the Villas. Induced by Niantic's unauthorized placement of hard-to-find Pokémon on Villas property, throngs of *Pokémon Go* players continued to trespass onto Villas property on a nightly basis, in order to be present during peak spawning hours. Often parking illegally, players crowded the Villas, talking, shouting, and playing music as the Villas' residents tried to sleep. *Pokémon Go* players stayed for hours each night, leaving garbage in their wake. Moreover, as the Villas and nearby Boardwalk lack public bathroom facilities, many *Pokémon Go* players used the Villas' landscaping to relieve themselves during their nightly incursions.

54.     With "out-of-control crowds" continuing to congregate on the Villas' property and making noise in the early hours of the morning, The Lojeta Group ("Lojeta"), the Villas' developer, contacted Niantic and requested that the Villas be removed as a Pokéstop. In

response, Lojeta received only an automated reply. Due to Niantic's inaction, Lojeta was forced to hire off-duty police officers to patrol the Villas from 11 p.m. until 4 a.m.

55.     By placing a Pokéstop on the Villas' property, and by programming rare Pokémon to spawn nearby, Niantic ensured that crowds of *Pokémon Go* players would regularly congregate at the Villas, many of whom could be counted upon to make in-game purchases, thus generating a revenue stream. However, Niantic imposed the foreseeable costs associated with its revenue stream—for example, the need to hire security guards and clean up trash and other waste from the property—squarely on the Villas, causing significant harm.

### Scott and Jayme-Gotts Dodich

56.     The case of Wahby Park presents another egregious example of the foreseeable consequences of Niantic's disregard for property rights. Wahby Park is a small municipal park in the City of St. Clair Shores, Michigan. Scott Dodich and Jayme Gotts-Dodich reside on Revere Street, a private cul-de-sac across the street from Wahby Park.

57.     In early July 2016, shortly after the release of *Pokémon Go*, the Dodichs noticed a significant increase in the number of visitors to Wahby Park, from an estimated 15 to 20 visitors at any given time to at least several hundred, most of whom were clearly focused on their mobile phones. (*See* Figure 4.) The Dodichs soon learned that Defendant Niantic had placed at least seven Pokéstops and one Pokémon Gym on the park. (*See* Figure 5.) In fact, Wahby Park topped *Click On Detroit*'s list of "Best places to play *Pokémon Go* in Metro Detroit," which described "[h]undreds of people walking around" and "[a]t least six Pokéstops, all constantly lured."[15]

---

[15] Dustin Block, *Best places to catch Pokemon in Metro Detroit*, Click On Detroit, July 28, 2016, 11:41 AM, https://www.clickondetroit.com/news/pokemon-map.

1
2
3
4
5
6
7
8
9
10



*Figure 4*

11
12
13
14
15
16
17
18
19
20
21
22



*Figure 5*

23
24

*An in-game map of Wahby Park and Revere Street (to the left),*
*displaying at least seven Pokéstops and one Pokémon Gym.*

25      58.      Over the next several weeks, Revere Street degenerated into "a nightmare" for

26   the Dodichs and their neighbors. Many of the visitors who flooded the park in search of

27   Pokémon paid scant attention to the property boundaries of the Dodichs or other residents of

28   Revere Street, and likewise disregarded the clearly posted sign advising that Revere Street was a

private road, with parking for residents and their guests only. *Pokémon Go* players parked their cars in front of the Dodichs' and their neighbors' homes, blocking their driveways. (*See* Figure 6.) *Pokémon Go* players trespassed on the Dodichs' and their neighbors' lawns, trampling their landscaping and peering into their windows. (*See* Figure 7.) When Mrs. Gotts-Dodich asked a *Pokémon Go* player to leave her property, she was told to "shut up B****, or else."



*Figure 6*



*Figure 7*

59.     On or around July 25, 2016, the Dodichs requested the removal of the Pokéstops and Pokémon Gym that Niantic had placed near their home, using the designated request form on the company's website. In response, they received only an automated form reply: "Thank you for reporting this PokéStop/Gym. We will review and take appropriate action. You'll receive a follow-up email once your request has been reviewed."

60.     Two days later, on July 27, 2016, the Dodichs had yet to receive the promised response from Niantic, and submitted two more requests—this time, via emails directly to Niantic's legal department and John Hanke, Niantic's CEO. The emails described to Niantic the conditions the company's actions had created on Revere Street, and stated, in part:

> At any given moment there are at least a couple of hundred people in the park play[ing] this game, compared to the average of at least 15-20 in the park. The [Pokéstops and Pokémon gyms] . . . [are] an **open invitation for the players to utilize our street, our lawns, looking in our windows** . . . and so forth. **There are at least 30 homes . . . that are affected by this. These players are loud, make threats, [are] intrusive, and I do not feel safe.** My husband and I moved to our home almost two years ago because it was peaceful, quite, and safe. **When I see people driving slow, looking into our home, walking on our property, looking into our vehicles, we do not feel safe.** Neither do the neighbors.
>
> . . .
>
>  With all the traffic it is hard to tell who is playing the game, or casing out our street/park, someone who is looking to rob, rape or any other harm. . . .
>
> **They park along our street that borders Wahby Park, we ask them to move and get threats and attitudes. I was threatened by a man who refused to leave. He was parked in front of my home. I had hardly any room to back out of my driveway.** Mind you, he was also parked the wrong way on the street.
>
> . . .
>
> I truly hope you will take this into consideration, the news has already been in the park twice, and have interviewed neighbors on this issue.

(Emphases added.)

61.     In response to this litany of detailed grievances—which reported trespassing and personal threats, and expressed concerns about robbery and rape— the Dodichs again received only a generic form reply, thanking them again for contacting Niantic and directing them to "visit the help center[]" for *Pokémon Go* on Niantic's website.

62.     Once again, the Dodichs did not receive any follow-up from Niantic. Accordingly, on August 1, 2016, the Dodichs wrote yet another email to the company:

> ***The past few weeks have been an absolute nightmare*** for not only my husband and I, but for the residents on our street as well. Almost two years ago my husband and I moved into our home, not knowing how drastically our once quiet, safe, and peaceful street has gone to the complete opposite.
>
> . . .
>
> Most recent I am seeking help for anxiety, I believe I will call it that and am seeking help. I guess you could say I had a nervous breakdown, never had to encounter this feeling in my life. ***We have veterans with PTSD and this traffic is getting to them as well.***
>
> ***Nobody gets sleep anymore. Constantly have to protect our homes from people on our property that invade, all because of the stops/gyms***. I will highlight the issues we are having:
>
> **Privacy:** Since our street borders the park, our privacy has been taken away from us. ***The stops/gyms border directly on our street, causing the gamers to take over our property as well as the parks. They are on our lawns, with the newest being looking right into our windows. How is this acceptable? They hang out on our lawns, trample landscaping, look in vehicles,*** hang out in the middle of the street looking at our homes while playing their game, so I hope. We ask them to leave but 75% percent of the time, they ignore us or call us names. . . .
>
> **Safety:** Along with our privacy being violated, our safety is a concern too. Our street is narrow, we have elderly, and special needs children that require a lot of care. It is not uncommon for an ambulance go down the street frequently. It is not safe for cars to be blocking emergency vehicles to get down the street to assist people that need care. ***We don't feel safe having people on our property looking into our home. Nor do we feel safe with random vehicles parking, driving slow, and hanging out on our street. We don't know who is playing***

*the game, who is looking at our homes to break in or steal, who is a pedophile or rapist. I don't feel safe sitting on our porch, something we love to do.* We have gotten heckled and yelled at for calling the police and we didn't ever do so. *I have been threatened because I asked someone to leave, he said shut up b**** or else.* What does or else mean?

**Traffic control:** We are a private street, with that being said the police cannot ticket or have vehicles removed. All day is constant traffic, either parking on the street or just driving real slow to catch the Pokémon, or just stop right in the middle of the street. When we ask these unwanted guests to leave, we are threatened, they don't listen, give attitude, and leave when they want, this goes on all night. *Blocking driveways, parking on the wrong side of the street, sitting in driveways, you name it they are doing it.*

Look at the traffic in the park, even after dark. They scatter when it is time to leave, *hiding on our street or in the bushes*, then come right back once police leave.

63.     Once again, the Dodichs received no reply beyond a generic form response.

64.     In mid-August 2016, after filing their initial complaint in the since-consolidated action *Dodich et al. v. Niantic, Inc. et al.*, 3:16-cv-04556, the Dodichs learned, through a Facebook posting, that they were the targets of an event titled "Defend *Pokémon Go* Meet Up," scheduled for August 21, 2016, organized by a pseudonymous *Pokémon Go* enthusiast on Facebook. The event posting referred to the Dodichs as "crybabies" and the concerns expressed in their complaint as "whining," and exhorted *Pokémon Go* players to assemble in strength near Wahby Park in an effort to intimidate the Dodichs into dropping their lawsuit:

So come on out and let's make a spectacle by occupying ol' Wahby! Wahby Park is only open from 8:30 AM to 9:00 PM, but *they can't stop the public from congregating in other public areas after 9 PM without closing times (think sidewalks, easements, or other creative ways to exercise your right to use public property)*.

. . .

A NOTE TO PROPERTY OWNERS NEAR WAHBY PARK:

> ***Please convince your neighbors Scott and Jayme Dodich to drop this
> frivolous lawsuit. The event will be cancelled if the lawsuit is
> dropped.***[16]

65.     After viewing the Facebook event posting, the Dodichs opted to leave their home
for the night of the event.

66.     The problem continued into 2017. By July 2017, the Dodichs had requested that
Niantic remove Pokéstops or Pokémon gyms numerous times and had even contacted the Better
Business Bureau. But 3 Pokéstops or Pokémon gyms were still accessible from the Dodichs'
property, and *Pokémon Go* players were walking on the Dodichs' lawn while making the
distinctive swiping gesture necessary to throw a Pokéball in the game.

67.     As with the Villas of Positano, Defendant Niantic successfully monetized Wahby
Park by filling it with Pokéstops and Pokémon gyms, thereby ensuring that hundreds of
revenue-generating *Pokémon Go* players would fill the park on a daily basis, and causing those
players to trespass on the Dodichs' property. Yet Niantic has refused to take responsibility for
any of the foreseeable consequences of transforming a quiet neighborhood park into a profit
center, and has instead imposed those costs on the Dodichs and their neighbors. Niantic's
actions have caused significant harm to the Dodichs, including threats of violence and
temporary displacement from their home by a Facebook-organized mob.

### Jill M. Barbarise

68.     Plaintiff Jill M. Barbarise is a resident of Oradell, New Jersey.

69.     Beginning in July 2016, Ms. Barbarise started noticing groups of teenage boys
congregating around her property, huddled around their smartphones.

70.     Around 10 p.m. on July 15, 2016, Ms. Barbarise was awakened by her dog
barking. She went outside to see what was going on, and she noticed a group of 6-8 people,
seemingly teenagers, huddled around their smartphones in a parking lot adjacent to her property,

---

[16] Arjay Cee, *Defend Pokémon Go Meet Up*, Facebook (Aug. 21, 2016)
https://www.facebook.com/events/1328617877166658 (emphasis added).

towards the north-east. (Ms. Barbarise's property and the parking lot were separated by a vinyl fence.) Similarly, around 7:25 p.m. on July 19, 2016, Ms. Barbarise heard her dog barking and then found a group of 4-6 people in the same parking lot, huddled around their smartphones. This was quite unusual for the neighborhood.

71.     Around 11:45 a.m. on July 21, 2016, Ms. Barbarise saw a group of 4 boys in front of her driveway, huddled around their smartphones in the same way. She asked what they were doing, and they told her they were playing the new Pokémon game and asked if they could enter her yard to catch a Pokémon located there. She declined.

72.     On July 23, 2016, Ms. Barbarise noticed that the gate in the fence between her property and the parking lot had been damaged. Specifically, the metal ground stake had been bent—suggesting that someone had attempted to pull the gate open. She had to pay $150 to have the ground stake replaced.

73.     Afterwards, she continued to find groups of teenage boys gathered next to her property, huddled on her smartphone. On several of these occasions, the disturbance caused her dog to start barking late at night, waking her up from sleep.

**Jason Sarkis**

74.     Plaintiff Jason Sarkis is a resident of Webster, New York. His property is adjacent to Milton Case Memorial Park, and his driveway includes a pedestrian access point to the park. There is a sign at the end of his driveway indicating a "Walking Entrance" to the park. He also often spends time taking care of the park.

75.     In July 2016, he noticed that large groups of people began congregating around the sign, often trespassing on his property as they did so, at all hours of day and night. He soon learned that Niantic had placed a Pokémon Gym at the location of the sign at the end of his driveway.

76.     For at least 6-7 weeks, large groups continued to gather around the sign. Many would trespass on his property, park in his driveway, trample and litter in his yard, and make lots of noise (sometimes screaming or yelling) during both daytime and nighttime hours. He had

to spend time every day picking up trash and cigarette butts from his yard. Over the course of the summer he also had to fix landscaping stones and hardscape that had been removed, as well as grass patches and flower beds that had been dug and kicked up.

77.     At the time, he had an 18-month old son and two small dogs, and his wife was in her second trimester of pregnancy. Previously, his family had been used to keeping the windows open and spending much of their time outside. But now, the constant traffic and noise not only kept his family awake at night, it also made them afraid and uncomfortable and prevented them from enjoying their own front and back yard for much of the summer.

78.     Many times, he politely asked the game-players to move or at least keep the noise down. They generally responded disrespectfully, such as by swearing or yelling at him for disturbing their game; several even threatened him. When his wife tried asking them politely, she was called a "bitch" and told to "go fuck [herself]."

79.     Mr. Sarkis also called 911 several times and even filed a police report about the problem, but to no avail.

80.     Both Mr. Sarkis and his wife sent numerous emails and complaints to Niantic, using the contact info posted on its website. As early as July 20, 2016—only two weeks after the game was released—he contacted Niantic via its website to request removal of the Pokémon Gym from his property and to complain to them about "vandalism and noise causing my 18 month old baby to be constantly woke up. Please. I have called the police but they can't help. Please remove this from my yard."

81.     On August 3, Niantic told him that it had "removed the PokéStop/Gym in question" and that he "should see these changes reflected soon." But for weeks, the crowds of players kept coming back as if nothing had changed.

82.     On August 11, he wrote to Niantic: "It has been a week and the gym is still here. Please can you expedite its removal." On August 12, he wrote to Niantic: "They gym has not moved yet and the radius has gotten bigger." On August 22, he wrote to Niantic: "This is still an issue. What have you fixed?!" On August 26, he wrote to Niantic: "i am getting more and more people in front of my house and in my yard. please remove this gym…like you said you would."

On September 12, he wrote to Niantic that the "gym is still active." On September 16, he wrote to Niantic: "The gym … is still active. My family is being harassed. I am begging you to please remove it. It has been 6 weeks since you said you would. My pregnant wife and 18 mo old child cannot go outside any longer because of the crowd in front of our house. Please end this. Please."

83.     However, Mr. Sarkis kept seeing groups of *Pokémon Go* players congregating by the sign at least until October 2016.

84.     Finally on October 3, he received a response from Niantic. NianticOpsLarry (*Pokémon Go*) wrote to him: "Thanks for your report. We have verified there are no Pokéstops or Gyms at that location."

**Melissa Perez**

85.     Plaintiff Melissa Perez is a resident of Tulare, California. Her home is on a corner lot within a development, and it has a swimming pool in the backyard.

86.     In July 2016, she suddenly started seeing large groups gathering in the intersection near her house. They constantly created loud noises at night, disrupting her and her husband's sleep and sometimes causing them to be late for work the next morning, which was particularly problematic because she often worked 16-hour shifts. Her dog would also often bark all night because he could hear the large groups.

87.     It turned out that Niantic had designated her pool as either a Pokéstop or a Pokémon Gym.

88.     Many of the *Pokémon Go* players trespassed on her lawn, trampled and killed much of the grass, looked over the fence around her pool, pulled and hung off the fence, and even broke planks on the fence. They constantly left empty soda bottles and candy wrappers all over her lawn. She and her husband had to spend hours cleaning up the yard and replacing and fertilizing the grass that had been trampled.

89.     She filed a police report, but the police officer told her there was nothing he could do because the trespassers would likely disperse as soon as the police arrived.

90.     In May 2017, because of all the broken planks and other damage to the fence, they ended up having to replace the whole fence—costing over $3000 as well as considerable time and aggravation. Even while the fence was being rebuilt, some of the construction materials were stolen, forcing them to spend an extra $100 on fence planks.

91.     Even after the fence was replaced, some *Pokémon Go* players continued to trespass—and some of them caused additional damage to the fence. In June 2017 and then again in August 2017, Ms. Perez's husband had to replace some of the planks in the newly-built fence.

### "Sam" Congshan Hao

92.     Plaintiff "Sam" Congshan Hao is a resident of Elmhurst, New York.

93.     Beginning in July 2016, he suddenly started seeing large groups (sometimes over 70) congregating near his house, often staying as late as 2 a.m. They created lots of noise, sometimes screaming and playing music. They blocked the sidewalk, drank beer, and smoked cigarettes. Some would even lean against the fence around his property or block the front gate.

94.     It turned out that Niantic had placed a Pokéstop at the intersection near his house. The issue even received media coverage, such as in a *Pix11* report titled "Drunken Pokémon players terrorize Elmhurst building."[17] A city council member, quoted in that article, reported that his office had been "flooded with complaints" such as that "75 to 100 people are playing late at night and partying throwing beer cans, cigarettes, urinating."

95.     Mr. Hao's windows are only 4 feet away from the sidewalk, so the constant noise and secondhand cigarette smoke were very disruptive to his family's sleep and also their health, particularly for his three young children—then of 5, 3, and 1.5 years of age. None of them could sleep well, the children often cried at night due to the disturbance, the parents worried about their children's lungs, and the family overall suffered considerable mental distress.

---

[17] Monica Morales, *Drunken Pokemon players terrorize Elmhurst building*, Pix11, July 19, 2016, http://pix11.com/2016/07/19/drunken-Pokémon-hunters-terrorize-elmhurst-building/.

96.     He called the police several times. Sometimes the police responded by dispersing the game players—but this was barely helpful, as players (maybe the same players, maybe different ones) would always return soon afterwards. Most of the time, the police took no action.

## Bruce Garton

97.     Plaintiff Bruce Garton lives in Nashville, Tennessee. Mr. Garton lives on the property with his wife and two children.

98.     In 2016, Mr. Garton witnessed about 3 to 4 people trespassing onto his property per day, and observed about 40-50 cars passing his house per day. Many cars parked in the street idly for long periods of time. Some parked in his driveway. Mr. Garton had to chase people off his property. The nuisance carried on for approximately one month. At the time, Mr. Garton's children were 3 years and 11 years old.

99.     Mr. Garton believed these were all Pokémon players because he asked one of the individuals, who was male, why he was on his property. The man responded that there was a Pokémon game item on his property that the man was attempting to capture.

100.     The Pokémon players were a constant nuisance to Mr. Garton and his family, causing them to feel unsafe in their own home, because they had no way of knowing whether people could be posing as players just to get onto the property and hurt the family or rob their home. The Gartons worried about their children's safety and were not comfortable having them play outside. The fact that the children were homeschooled made the problem worse.

101.     Further exacerbating their anxiety, an individual engaging in the Pokémon game was fatally shot in a road rage incident at a cemetery about a mile from the Garton residence.[18] This incident made his family even more nervous.

102.     Although Mr. Garton called the company to complain and to ask that his property be removed from the game, he never received a response.

---

[18] Jason Gonzales, *Nashville police: Man fatally shot after road rage incident*, Tennessean, Dec. 25, 2016, http://www.tennessean.com/story/news/crime/2016/12/25/nashville-police-investigates-fatal-road-rage-incident/95841342/.

**Sally Rogers**

103.   Plaintiff Sally Rogers owns property in Tesuque, New Mexico. Her property is immediately adjacent the Shidoni Foundry, Gallery, and Sculpture Gardens, in Tesuque, New Mexico.

104.   There are two residences towards the northern end of her property; she resides in one and rents out the other. On the remainder of her property, she has allowed Shidoni to display certain outdoor sculptures and to allow visitors to access those sculptures for viewing and possible purchase. The sculpture garden area is clearly posted as being open from "9:00 a.m. to dusk."

105.   The two residences on her property are clearly separated from the sculpture garden area by a fence, with a driveway-wide opening in the middle. There are four prominent signs on the fence indicating that these are private residences with no trespassing allowed.

106.   At some point before July 2016, there had been a "Bacon and Eggs" sculpture displayed in the sculpture garden area of her property. The sculpture was approximately 15 feet away from the fence and 35–40 feet away from Ms. Rogers's residence. By July 2016, that sculpture had been removed.

107.   In early July 2016, she suddenly noticed (and was puzzled by) a large number of people who started showing up and wandering around her property while holding up their smartphones.

108.   Having heard news reports about *Pokémon Go* and about various businesses and other locations across the country being inundated with players, she confronted one trespasser and asked what he was looking for. He said he was looking for a Pokéstop and showed her on his iPhone what the Pokéstop looked like. As it turned out, the *Pokémon Go* game displayed a Pokéstop with a picture of the "Bacon and Eggs" sculpture that had previously been on Ms. Rogers's property.

109.   Throughout much of the summer, *Pokémon Go* players wandered all over her property, apparently trying to find the "Bacon and Eggs" sculpture whose picture was displayed

with the Pokéstop, but being unable to find it. At many different times, day and night, Ms. Rogers saw people walking back-and-forth and in circles on her property while holding up their smartphones, sometimes singly and sometimes in groups, apparently trying to find a sculpture that was no longer there. Many of the same people came back multiple times, walking around with their smartphones up in circles in the same way.

110.    Players frequently walked into the private-residences area—walking through the opening in the fence while completely ignoring the signs clearly indicating private property and warning against trespassing. This happened at all hours of day and night. Often in the morning, she would look out her window and see *Pokémon Go* players in her front yard and parking area, wandering around with their phones held up. She also, several times, directly observed *Pokémon Go* players walk right up to the fence, read the no-trespassing signs, and then blatantly ignore them and enter the private residence area. She even had to chase innumerable people off her property.

111.    Even when *Pokémon Go* players remained in the sculpture-garden area (without also trespassing into the private-residences area), many would arrive at all hours of the evening and night, even though area was clearly posted as being open from "9:00 a.m. to dusk." They made noise and disrupted her ability to enjoy and use her own home.

112.    When she asked *Pokémon Go* players to leave her private property—even if late at night—some of them actually cursed at her or became angry simply because she had asked them to leave. Some were drunk and belligerent. She did not always feel safe in dealing with them. She also could not tell if some of them might be scoping out her property for possible theft or burglary under the guise of playing the game.

113.    These problems from *Pokémon Go* players were a daily occurrence throughout the summer of 2016 and into the fall. The daily stream of intruders and trespassers made her feel constantly intruded-upon and on-edge about what might happen during the night and after dark. In effect, the game, without her prior knowledge or permission, had completely undermined her ability to lead her normal home life privately and securely.

114.    On July 30, 2016, she contacted Niantic by sending the following email:

You need to immediately remove this location from your game; this is not a "request." It is a Cease and Desist Order which will be followed by legal action if you do not comply. You have made my private property one of your stops and every person who comes there is illegally TRESPASSING. The location is at the Shidoni Foundry and Sculpture Gardens, in Tesuque, New Mexico, 87575 USA. You used a photo of a sculpture entitled "Bacon and Eggs" as a stop at this location. Shidoni is NOT a public park; the location/stop you have used is my private property which I am allowing the foundry/sculpture garden to use. They do not own the location you have made into one of your stops -- I do. I do not want a bunch of people tromping all over my property as part of your game. What you have done is invite the whole world to property that has my private residence on it, for your own purposes and your own financial gain. Remove this site/stop immediately.

115.    In response, she received only an automated email:

Thank you for reporting this PokéStop/Gym. We will review and take appropriate action. You'll receive a follow-up via email once your request has been reviewed.

116.    She received no other response until November 21, 2016—4 months later—when she received the following email:

Thank you for your report and please accept our sincere apology for the delay in response due to the unusually high usage of the game, and subsequent requests, for both the removal and addition of game locations. It has taken us longer than we would like to review your request.

We have found that the number of players visiting locations has eased to a manageable level in the time since the initial excitement of the product launch which is why we wanted to check in to see if this was still a concern.

Due to problems in the past with unwanted removals, before we can take action we need to confirm that you are the owner of this property and that you have the authority to make the final decision on this matter. If you would like to proceed with this request, please reply to this message with the following statement to confirm that you are authorized to make this request: "I am the owner of the property or

have authority to make this request with the owner's consent." Please include your title and your phone number.

Once we have received this information we will promptly proceed in reviewing your request.

117. She responded on November 22, in relevant part:

I am the owner of this property and have absolute authority to make this "request." However, as noted MONTHS AGO, THIS IS NOT A REQUEST, IT IS AN ORDER FOR NIANTIC TO CEASE AND DESIST.

You sleazy pricks don't seem to realize that you are not in the driver's seat on this; you are breaking the law and you are violating my property rights, along with the rights of many other private citizens across this continent and the world, who have dealt with the same bunch of idiotic trespassers and property damagers that you have unleashed without authorization and consent. Niantic et al has made millions off the inconvenience, intrusion, violation, and misery of others, and yet you blithely take a half a year to respond -- and when you finally do, it is a do-nothing BULLSHIT EMAIL that merely repeats your previous asinine view that you have the right to "decide" whether I have to put up with your shit, vis-à-vis MY PROPERTY. Again, for your thick skulls: MY PROPERTY, not yours.

The class action lawsuit I have joined, along with the US court system, will be the ultimate deciders and I am confident that you will be on the receiving-end of justice, and will be paying for breaking the law over and over again. In the meantime, I will be exercising my right to have trespassers arrested (and my big mean dog probably won't be waiting for the police to arrive). Here's my "suggestion" for you lazy-ass pricks in the meantime: Remove this location immediately, or you and your stupid gamers can and will suffer the consequences - all of them.

(emphasis added).

### **Deborah J. Pimentel**

118. Plaintiff Deborah J. Pimentel is a resident of Pleasant Grove, Utah.

119.     In July 2016, she began noticing unfamiliar cars parking immediately adjacent to her home, at odd hours all day and at least as late as midnight, sometimes blocking her driveway. The drivers would generally stay in their cars for 15–30 minutes, sometimes with the lights on and sometimes off, sometimes with the motor on and sometimes off. She could see that the drivers were always holding up their smartphones. On average she saw 3 cars doing this every day; at times, she saw up to 5 at once. These cars often created enough noise to wake her out of a sound sleep.

120.     Around July 31, 2016, she saw a car idling with its headlights off, on the side of her house near the entrance to the backyard. This scared her. Only a few months earlier, her home had been burglarized and she had interrupted the burglars during the burglary. There had also been two separate attempted burglaries since then via the path from the side entrance towards the back door. So she called the police. However, the car was gone by the time the police arrived.

121.     Over the next week, as unfamiliar cars kept parking near her house in the same way with the drivers holding up their smartphones, she called the police two more times, both times late at night. The police spoke to one of the drivers and were told that there was a Pokémon Gym right in front of her house. This eased some of her fears, but did nothing for the noise and disruption.

122.     Shortly thereafter, she saw a car blocking her front driveway and told them to leave. The driver and passenger were on their phones and she could see animated pictures on their screens.

123.     These disruptions slowed down after the summer of 2016, but picked up again in the summer of 2017. In May 2017, she once again noticed unfamiliar cars parking near her house with the drivers holding up their smartphones, as they had before. Around June 2017, she started seeing large groups of people congregating on the sidewalk and sometimes trespassing on her driveway. She has seen at least two people trespassing onto her lawn, and she has recently had to clean litter and cigarette butts on her lawn.

**Loren Morgan**

124.    Plaintiff Loren I. Morgan resides in Gahanna, Ohio, in the same neighborhood as the Gahanna Historical Society.

125.    According to Mr. Morgan, Niantic placed Pokémon game items at the Historical Society, the Log Cabin Home, and the Gazebo, which are all located near Mr. Morgan's home. These items attracted hordes of *Pokémon Go* players at all hours of the night. *Pokémon Go* players trespassed onto Mr. Morgan's property, as well as his neighbor's properties. In addition, the players initiated verbal altercations and littered on and around the properties (litter consisting of beer cans and bottles, candy wrappers, and cigarette butts). Mr. Morgan has suffered sleep deprivation as a result of being woken up by Pokémon players' nighttime activities.

**Many Other Examples**

126.    These are just a few examples of the consequences of Defendant Niantic's disregard for property rights. Many other examples are easy to find through media coverage and general internet searches.

127.    In a series of tweets on July 9, 2016, Boon Sheridan, a resident of Holyoke, Massachusetts, reported that Niantic had placed a Pokémon gym in his home. By mid-afternoon that day, Sheridan reported that "I've counted 15 people stopping by and lingering in their phones so far. I think at least three car visits as well."[19] He commented that he "[c]an't wait to talk to my neighbors about it. 'So, all these people pulling up at all hours? We don't know them… and we can't stop it.'"[20] He also "pointed out that the ***problems could easily lead to the value of his house going down*** and issues with his neighbours. The strange behaviour of people

---

[19] Boon Sheridan (@boonerang), Twitter (July 9, 2016, 11:46 AM), https://twitter.com/boonerang/status/751849914154483712.

[20] Boon Sheridan (@boonerang), Twitter (July 9, 2016, 8:31 PM), https://twitter.com/boonerang/status/751982090003120132.

around his location – people turning up at all times and then leaving soon after – could easily lead people to speculate that drug dealing or other crime was happening there."[21] In an interview with the online publication Buzzfeed, Sheridan "said it is a little odd that **he has no control over his home being a significant part of the game, and never signed off on being included**."[22]

128.    Likewise, as reported in the online videogame publication *Gamerant*, Niantic placed a Pokéstop at a private residence in Albuquerque, New Mexico, already famous as a filming location for the television show *Breaking Bad*. *Gamerant's* article stated, in part, that the home's "yard is being besieged by intrepid *Pokémon Go* trainers who may not be aware they're stepping onto private property."[23]

129.    Incredibly, Niantic even placed **at least three Pokéstops within the United States Holocaust Memorial Museum** in Washington, D.C. (*see* Figure 8), prompting the museum to state that "Playing the game is not appropriate in the museum, which is a memorial to the victims of Nazism. We are trying to find out if we can get the museum excluded from the game." Similarly, a representative of Mobile Memorial Gardens, a cemetery in Mobile, Alabama, has objected to the presence of *Pokémon Go* players on its property, stating "This is private. I owe it to the families we serve to provide a sense of decorum here."

---

[21] Andrew Griffin, *Pokemon Go Turns Man's Home Into a 'Gym', Causing Chaos*, The Independent, July 10, 2016, http://www.independent.co.uk/life-style/gadgets-and-tech/gaming/pokemon-go-man-s-house-accidentally-turned-into-a-gym-causing-huge-problems-a7129756.html (emphasis added).

[22] Stephanie McNeal, *People Are Flocking To This Guy's House Because It's A Gym On Pokémon Go*, Buzzfeed, July 10, 2016, https://www.buzzfeed.com/stephaniemcneal/Pokémon-go-house?utm_term=.pqWaeK3GPV#.pvO6bRYEBQ (emphasis added)

[23] John Jacques, *6 Strange Pokemon Go PokeStops*, GameRant, https://gamerant.com/strange-pokemon-go-pokestops/ (last visited Aug. 28, 2017).



*Figure 8*

130.    Niantic blithely acknowledged its placement of Pokéstops on private property, advising users on the *Pokémon Go* website: "If you can't get to the Pokéstop because it's on private property, there will be more just around the corner, so don't worry!"[24] (*See Figure 9.*)



*Figure 9*

\* \* \* \* \*

131.    Milwaukee County responded to these problems by passing an ordinance requiring Niantic and any other creators of "location-based augmented reality games" to obtain a permit before incorporating any county park locations into the game. According to the text of the ordinance, this was necessary because "the sudden mass influx of *Pokémon Go* players in Lake Park, in particular since July 6, 2016, has resulted in ***unanticipated consequences,***

---

[24] http://www.Pokemongo.com/en-us/explore/, accessed on August 28, 2017.

*including, but not limited to: increased litter and waste in the park, inadequate bathrooms to accommodate the high ratio of people, after-hours violations, enhanced security oversight, unauthorized vendors, significant daily traffic congestion, parking violations, trampled grass*, and related concerns about sensitive flora and fauna areas."[25]

132.   The County Board explained why the permit requirement was necessary:

> The permit requirement is in response to the ***County Parks Department's inability last summer to hold Niantic Inc. and its Pokémon franchise financially accountable for damage done at Lake Park after daily throngs of players packed the park*** beginning in July, Supervisor Sheldon Wasserman said.
>
> ***The county was not notified when Niantic placed game characters at numerous historic landmarks within the park***, officials said.
>
> ***County taxpayers were stuck paying for "thousands of dollars" of damage to the park***, according to Wasserman. Lake Park neighbors took photos and recorded videos of ***empty beer cans, trash piles, trampled turf and overflowing toilets***. There were complaints of traffic congestion, late-night activity and unauthorized vendors.
>
> The permit requirement — adopted Thursday by the board — targets creators of the games and does not restrict public access to the parks, Supervisor Marcelia Nicholson said in support of the ordinance.[26]

133.   More recently, as Niantic has updated the game in various attempts to keep players interested, the social and real-world impacts of the game have only gotten more and more prominent.

134.   In February 2017, Niantic introduced a large number of new Pokémon creatures. In Kimberly Point Park in Neenah, Wisconsin (as in many other places), this caused a major disruption:

---

[25] Milwaukee County, Wisc., Ordinance 16-637 (Feb. 2, 2017), available at https://milwaukeecounty.legistar.com/View.ashx?M=F&ID=4804249&GUID=F4E4091F-6450-42FB-B949-0A9EB71EC3B6 (emphasis added).

[26] Don Behm, *Milwaukee County requires parks permit for Pokémon*, Post Crescent, Feb. 3, 2017, http://www.postcrescent.com/story/news/local/milwaukee/2017/02/03/milwaukee-county-requires-parks-permit-pokmon/97444996/

*The Generation 2 release brought out players in droves*. It coincided with a week of unseasonably warm weather that melted snow and thawed frozen ground. ***The heavy foot traffic turned the park lawn into a muddy mess. City crews had aerated and reseeded the lawn last fall to repair damage done by Pokémon Go players***.

"It was just that perfect storm, with the new release of characters and great weather," Kading said.

Upon realizing the damage, Kaufert ordered crews to fence the area to prevent further harm. He said the number of people in the park was estimated at 350 several days after the Gen 2 release.

"The park was not built for that many people," he said.

135.   Recently, Niantic has updated the game by adding a new "motivation system" affecting how players interact with Pokémon Gyms and by adding a new "Raid Battle" feature allowing multiple Trainers to work together "to defeat an extremely powerful Pokémon known as the Raid Boss."

136.   By design, Raid Battles can *only* be played in groups.

137.   This created a resurgence of interest in the game, thus predictably creating a resurgence of real-world impacts on all of the physical places that players actually played the game. As one article explained:

*Pokémon Go* introduced an all new raid system. They later on introduced Legendary Pokémon as raid bosses and everyone wants a shot at them. Trainers all over the world flocked to locations that were flagged as gyms.

However, some of these gyms happen to be attached to private property. They are also attached to institutions like police and fire departments. Not to mention, they are also attached to holy places such as churches.

* * *

***Due to the placement of some of the gyms and at times the placement of rare Pokémon, players are venturing into places they shouldn't be.***

In Connecticut for example, a local Newington Fire Department voice their concerns over ***players getting in the way while they are responding to calls***.

"The volunteer fire department took to Facebook on Tuesday, saying it had come to their attention that the fire headquarters on Main Street is a location of interest for the *Pokémon Go* players," according to WFSB.

"Fire officials said while they support the community and visitors, **they can't have their parking lot filled with 'Pokémon hunters,' because those spots are for firefighters responding to calls**."

**It's easy to see how this could become a hazard for both players and firefighters**. For some players in rural areas, there aren't many options. A lack of monuments or notable buildings cause Pokéstops and gyms to appear in areas they probably shouldn't.

**This is at no fault of the players. Some stops and gyms in the game are poorly located in areas where players could be admonished for playing in. It is important to note that trainers of all ages play the game, so while some understand the right and wrong places, others may not be so understanding**.[27]

<u>**Without Being Able to Exploit The Private Property Of Others, Niantic's Business Model Would Be Severely Weakened**</u>

138.     *Pokémon Go* has been immensely profitable for Niantic. The game's profitability derives from its popularity, which, in turn, derives in large part from its augmented reality experience, in which playing *Pokémon Go* turns a user's surroundings into a virtual world of beacons to be activated and Pokémon to be captured.

139.     But as noted above, the game inherently requires large groups of players congregating in close physical proximity, which creates obvious foreseeable costs and expenses and logistical challenges.

140.     Thus, to create that immersive world, Niantic made unauthorized use of Plaintiff's and other Class members' property by placing Pokéstops and Pokémon gyms

---

[27] Navi, *Pokémon Go Resurgence Raises Concerns On Trespassing*, Neurogadget, July 26, 2017, http://neurogadget.net/2017/07/26/Pokémon-go-resurgence-raises-concerns-trespassing/55579 (emphases added).

thereupon or nearby. In so doing, Niantic has caused *Pokémon Go*'s millions of players to make unwanted incursions onto the properties of Plaintiffs and other members of the class—a clear and ongoing invasion of their use and enjoyment of their land that has caused significant harm to Plaintiffs and the other members of the class and from which Niantic has profited and continues to profit.

141.    If Niantic had to pay for the foreseeable physical expenses of having large groups of players congregating for hours and hours, it would have a very different business model.

142.    For example, Niantic produced and hosted "*Pokémon Go* Fest" in Grant Park in Chicago on July 22, 2017. Niantic's advertising for the event promised the chance to capture rare Pokémon creatures and to work with thousands of other players on various challenges with special in-game rewards. Niantic sold tickets for $20, and it expected 20,000 attendees.

143.    The event was a disaster.

144.    Due to Niantic's failure to prepare for the number of attendees, many of them had to wait in line for hours to enter. Just before noon—two hours after the start time—Twitter user @Rager67 commented, "Umm you know you have 75% of PAYING customers outside still? Probably 2-3 hours from getting in the very small park. What were you thinking?"[28]

145.    Once players were able to enter the park, many were unable to access the game servers due to technical issues with Niantic's servers and software—the kind of logistical problem that Niantic presumably should have been best able to anticipate and plan for.

146.    Many attendees were not even able to connect to the internet because the crowd overloaded the cellular towers and mobile data networks in the area—a widely-known problem at large events of any kind, and another problem that Niantic, a software company, should have been most able to anticipate and plan for.

147.    As one article summarized:

> In case you missed it: ***Pokémon Go Fest went about as poorly as it could have***. Visitors who traveled from far and wide spent hours in the

---

[28] Andrew J. Rager (@Rager67), Twitter (July 22, 2017, 8:52 AM),
https://twitter.com/Rager67/status/888788955461767170.

blistering sun, unable to play the game due to massive bugs and server errors. No one felt the heat more than Niantic, the game's developer, which was ***shocked by just how much of a disaster the event was***.

"Obviously they can't completely make it up to all the people who have come out to Chicago today, but they want to extend the fact that they're extremely apologetic and unhappy with the process and the results," a spokesperson told a small group of press on behalf of the development team toward the end of the event. "So hopefully this is something that we will never see replicated again, learn from this and move on."

The developer already started to make amends during *Pokémon Go* Fest. Attendees were frustrated — and loud about it — by their inability to play the game during the day, which led Niantic to offer compensation. First, the company promised $100 of in-game currency to all ticket holders. Not long after that, Niantic offered full refunds to everyone for their $20 wristbands.

"Just know that the staff here are pretty horrified with the results, so they want to make good as fast as possible," the spokesperson told us, just before Niantic put out a much softer official apology on its website.

"I'm super sorry guys — I'm really sorry especially for everyone who traveled international, East Coast, from all over," he continued telling press. "So this clearly was not what we were hoping for today. Thanks for your patience."[29]

148.   All of this suggests that Niantic lacks the ability to provide and manage and maintain usable physical space where players can enjoyably play the game. Therefore, it is much easier and more profitable for Niantic to have its game players congregate on or near property that is owned and maintained by other people, thus allowing Niantic to avoid the financial expenses and logistical challenges inherent in a game requiring large groups of players to congregate in close physical proximity for extended periods.

---

[29] Allegra Frank, *Niantic 'horrified' by Pokémon Go Fest*, Polygon, July 24, 2017, https://www.polygon.com/2017/7/24/16019576/Pokémon-go-fest-disaster.

149.    Moreover, the nature of the game ensures that the only way for Niantic to keep players interested is to keep adding content. But because the gameplay itself is so simple and repetitive (largely by design, because this makes the game accessible enough to go viral), the primary source of depth in the game is the need for real-world travel and the social engagement inherent in large groups of players congregating in close physical proximity.

150.    For example, the recently-added "Raid Battles" feature led to a major resurgence of interest in the game because it fosters precisely this kind of collaborative gameplay among large groups of players all in the same physical place.

151.    But collaborative gameplay among large groups of players all in the same physical place requires an *actual physical place*, and it creates significant logistical challenges that *someone* has to be responsible for. Niantic has shown that it lacks the capability to provide any manage that physical place providing and managing that space—which means Niantic can only keep players interested (and thus keep up its revenue streams) if it keeps being able to exploit physical places managed by others.

152.    One commentator explained just how quickly players are likely to lose interest if Niantic stops giving them new opportunities for collaborative gameplay on a regular basis:

> ***Legendary Raids have been a vital addition to the game, giving us a reason to collaborate with other players***, a destination for previously aimless Pokéwalks and, crucially, top-tier rewards that make the game feel a whole lot less stingy in the past. They take time, however: time to walk, time to wait on other people, time to head to the next one and make sure you've still got a group together. That's all good and fine, but it means that keeping up with the game takes a bit more of a commitment than it used to, and people appear to be getting worn out....
>
> ***The casual player might be a bit confused: "just don't play the game" would be their obvious answer. But that doesn't really work for either the more dedicated player or the developer, which relies on said dedicated players for its revenue***. Hardcore players want all the new rewards that have been made available, and ***taking a step back from it takes you out of the rhythms of daily play***. If you start to feel overwhelmed, you might indeed stop playing for a bit, and that bit might turn into much longer if the game continues to add more

rewards in without you. ***It's a balancing act to keep things engaging without throwing too much at people. Addicts don't leave Legendaries on the table, but they also don't know when to stop***.

The problem, of course, is that it's going to be awfully hard to take Legendary Raids away for ***any period of time will remind us just how hollow the game is at the core***. I've already completed my Pokédex and assembled a team strong enough to make a solid contribution to most Raids currently available: all that's left for me right now is grinding my level up and slowly powering up an even wider array of Pokémon. I'll still do it, because it's nice outside and I just got this in the mail, but ***Legendary Raids are really what keep me going at this point. Taking them away would easily knock me back to playing on the weekends, if that***.

Other games have limited time events as well, but more content in the middle helps to build a more natural rhythm into the game. *Pokémon Go* could keep us entertained with NPC battles, real daily quests, or PvP fighting, but all of those remain little more than mirages on the horizon. ***Pokémon Go is a game that sucks you in when it adds new content or even just tweaks reward values with a new event, but a few weeks of playing can burn you out and leave you aimless until the next content drop***. Constant Legendaries risk becoming part of that background noise rather than the special events that they are. That will mean fewer groups will form to take them down and they'll lose that focus that makes them work.[30]

#### The Requested Injunction Would Cost Niantic At Least $5 Million

153.    In this case, Plaintiffs are seeking an injunction requiring Niantic to remove all Pokéstops and Pokémon Gyms that are within 100 meters of any private property unless the property owner has given prior authorization for the placement. The injunction would also forbid Niantic from placing any new Pokéstops or Pokémon Gyms within 100 meters of any

---

[30] Dave Thier, *'Pokémon GO:' Legendary Fatigue Is Real, Especially With Mewtwo On The Way*, Forbes, Aug. 16, 2017, https://www.forbes.com/sites/davidthier/2017/08/16/pokemon-go-legendary-fatigue-is-real-especially-with-mewtwo-on-the-way/#3d476c8929f4 (emphases added).

private property unless the property owner has given prior authorization for the placement. Such an injunction is necessary to protect property owners from trespass, property damage, noise, and other interferences to their property rights and to their ability to use and enjoy their property.

154.    However, such an injunction would significantly undermine Niantic's ability to keep players interested in the game. In densely-populated areas like New York City or San Francisco, Pokéstops and Pokémon Gyms would likely be relegated to large parks such as Central Park. Many players would not be able to play on a regular basis, in the same way that many Manhattanites do not have easy daily access to somewhere they can play soccer or football.

155.    For many of the reasons detailed *supra* at ¶¶ 33–49, 138–152, a smaller gameboard—with fewer Pokéstops and fewer Pokémon Gyms—would make *Pokémon Go* a less appealing game because there would simply be less to do. Many players would play less often, others would stop playing at all, and far fewer people would be making in-game purchases of PokéCoins or Legendary Raid Passes. This would significantly undercut Niantic's revenue streams from the game.

156.    In addition, an injunction would impose administrative costs on Niantic, such as for removing existing Pokéstops and Pokémon Gyms, keeping much closer track of private property locations, and communicating with property owners attempting to obtain their consent.

157.    Thus, such an injunction would decrease Niantic's revenue from *Pokémon Go* by 2%, *at the very least*. As noted above, *Pokémon Go* has generated $424 million in revenue in the United States in one year. Thus, such an injunction would cost Niantic at least $8.48 million.

## <u>CLASS ACTION ALLEGATIONS</u>

158.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

159.     The proposed nationwide class (the "Class") Plaintiffs seek to represent is defined as follows:

> All persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent of such property owner or lessee, as a Pokéstop or Pokémon Gym in the *Pokémon Go* mobile application.

160.     Excluded from the Class are Defendant; any entity or division in which it has a controlling interest; its legal representatives, officers, directors, assignees, and successors; and its current or former employees.

161.     Plaintiffs reserve the right to amend the Class definitions and to add additional sub-Classes as appropriate if discovery and further investigation reveal that the Class should be expanded, divided into sub-Classes, or modified in any other way.

## Numerosity & Ascertainability

162.     Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.

163.     The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

## Typicality

164.     Plaintiffs' claims are typical of the claims of the Class, as Plaintiffs and the other members of the Class sustained damages arising out of the same wrongful conduct by Defendant, as alleged herein.

**Adequate Representation**

165.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation nationwide.

166.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**Predominance of Common Issues**

167.    There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members, the answer to which will advance resolution of the litigation as to all Class members. These common legal and factual issues include, *inter alia*:

  a.  whether Niantic designated GPS coordinates located on private property as Pokéstops or Pokémon gyms;

  b.  whether Niantic's conduct constituted a trespass and/or nuisance at common law and if so, what remedies are available by law;

  c.  whether the Court should enjoin Niantic from continuing to engage in the conduct complained of herein;

  d.  the appropriate measure of relief, including but not limited to a preliminary and/or permanent injunction; and

  e.  the extent of the damages caused by Defendant's acts.

**Superiority**

168.    Plaintiffs and other Class members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

169.    Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that few if any Class members could afford to seek legal redress for Defendant's misconduct as alleged herein. Absent a class action, Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.

170.    Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class action treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

# COUNT I

## Nuisance—Brought on Behalf of Plaintiffs and the Class against Niantic

171.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

172.    At common law, an invasion of one's private interest in the use and enjoyment of their land that causes significant harm constitutes a nuisance.

173.    As described above, via designation of specific GPS coordinates, Niantic intentionally placed Pokémon, Pokéstops, and/or Pokémon gyms on or near the properties of Plaintiffs and other members of the proposed Class.

174.    Niantic undertook the foregoing conduct without authorization from Plaintiffs or other members of the proposed Class.

175.    The foregoing conduct has caused foreseeable incursions by *Pokémon Go* players onto the property of Plaintiffs and the other members of the proposed Class, thereby invading their use and enjoyment of their properties.

176.    Plaintiffs and other members of the class have been significantly harmed in a variety of ways by these incursions, including but not limited to suffering property damage,

receiving threats of physical harm from *Pokémon Go* players, incurring costs to clean waste and debris from their property, and incurring costs to secure their properties against unwanted incursions.

177.     The invasion described above remains ongoing, as at the time of the filing of this Complaint, Niantic continued to designate GPS coordinates on or near the properties of Plaintiffs and other members of the proposed Class as Pokémon spawning locations, Pokéstops, and/or Pokémon gyms in *Pokémon Go*.

178.     The foregoing conduct constitutes a nuisance.

179.     As a direct and proximate result of Niantic's actions, Niantic is liable to Plaintiffs and the other members of the proposed Class.

## COUNT II

### Trespass—Brought on Behalf of Plaintiffs and the Class against Niantic

180.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

181.     At common law, a party is liable for trespass if it enters land in the possession of another or causes a thing or third person to do so.

182.     As described above, via designation of specific GPS coordinates, Niantic intentionally placed Pokémon, Pokéstops, and/or Pokémon gyms on or near the properties of Plaintiffs and other members of the proposed Class.

183.     By these placements, Niantic caused things—Pokémon, Pokéstops, and/or Pokémon gyms—to enter the properties of Plaintiffs and other members of the proposed Class.

184.     By virtue of the incentives created by and criteria for success in the *Pokémon Go* mobile game, Niantic induced *Pokémon Go* players to go to the locations of the Pokémon, Pokéstops, and/or Pokémon gyms in order to advance their progress in the game. Niantic thereby caused third persons to enter the properties of Plaintiffs and other members of the proposed Class.

185.     The foregoing conduct remains ongoing, as at the time of the filing of this Complaint, Niantic continued to designate GPS coordinates on or near the properties of Plaintiffs and other members of the proposed Class as Pokémon spawning locations, Pokéstops, and/or Pokémon gyms in *Pokémon Go*.

186.     The foregoing conduct constitutes trespass.

187.     As a direct and proximate result of Niantic's actions, Niantic is liable to Plaintiffs and the other members of the proposed Class.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiffs demand judgment against Niantic as follows:

A.   Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as the Class representatives;

B.   Awarding Plaintiffs and the other members of the Class damages, disgorgement or other monetary or equitable relief provided by and pursuant to the common law claims cited above or as the Court deems just proper;

C.   Enjoining Niantic from continuing the wrongful acts and practices alleged;

D.   Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest;

E.   Awarding Plaintiffs and the other members of the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

F.   Awarding such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury.

Dated: August 28, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:    (212) 661-1100
Fax:    (917) 463-1044
Email: jalieberman@pomlaw.com
          mjsteven@pomlaw.com
          aiqbal@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiffs*