Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
1100 Glendon Avenue
Los Angeles, CA 90024
Phone: 310-405-7190
Email: jpafiti@pomlaw.com

(additional counsel on signature page)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **IN RE POKÉMON GO NUISANCE LITIGATION** | **Case No. 3:16-cv-04300-JD**<br><br>__CLASS ACTION__<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>Date:      August 22, 2019<br>Time:     10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge:   Hon. James Donato |

{00328908;13 }

# **Table of Contents**

Issues to Be Decided ............................................................................................................ vi

Introduction ......................................................................................................................... 1

Statement of Facts and Procedural History ......................................................................... 1

    I.      Allegations of the Complaint ................................................................. 1

    II.     Procedural History ................................................................................ 4

    III.    Discovery ............................................................................................. 5

    IV.    Settlement Negotiations and Motion for Preliminary Approval ............ 6

    V.     Terms of the Proposed Settlement ........................................................ 6

         A.     Settlement Class ....................................................................... 6

         B.     Injunctive Relief ...................................................................... 7

         C.     Release by Settlement Class Members .................................... 10

    VI.    Preliminary Approval and Dissemination of Notice............................ 10

Argument ........................................................................................................................... 12

    I.      The Court Should Certify the Settlement Class and Appoint Plaintiffs' Counsel as Class Counsel .................................................................. 12

         A.     Numerosity ............................................................................ 12

         B.     Typicality and Commonality under Rule 23(a) ........................ 13

         C.     Adequacy of Representation .................................................... 14

         D.     Class Certification is Appropriate under Rule 23(b)(2)............ 14

         E.     Appointment of Counsel under Rule 23(g)............................. 15

    II.     Notice to the Settlement Class Satisfied Rule 23 and Due Process ..................... 16

    III.    The Court Should Finally Approve the Settlement................................ 18

         A.     Standards for Judicial Approval of Class-Action Settlements.................. 18

         B.     The Settlement Process Was Procedurally Fair ....................... 19

         C.     The *Hanlon* Factors Confirm that the Settlement Is Fair, Reasonable, and Adequate .......................................................................... 21

             1.     Settlement Relief Obtained .......................................... 21

             2.     Overall Strength of Plaintiffs' Case; Risk, Expense, Complexity, and Likely Duration of Further Litigation; and Risks of Maintaining Class Action Status.................................. 23

             3.     Extent of Discovery Completed; Stage of Proceedings............... 26

             4.     Experienced Counsel Negotiated the Settlement in Good Faith and at Arm's-Length and Believe It Is Fair, Reasonable, and Adequate .......................................................................... 27

             5.     The Absence of a Governmental Participant ................. 28

             6.     The Positive Reaction of the Settlement Class ............. 28

Conclusion ......................................................................................................................... 29

{00328908;13 }

i

# <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Aarons v. BMW of N. Am., LLC*,
  No. 11-cv-7667 PSG, 2014 WL 4090564 (C.D. Cal. Apr. 29, 2014).....................................25

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) ...........................................................................................16

*Candy Lab Inc. v. Milwaukee Cty.*,
  266 F. Supp. 3d 1139 (E.D. Wis. 2017).............................................................................28

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981)............................................................................................................18

*Chun-Hoon v. McKee Foods Corp*,
  716 F. Supp. 2d 848 (N.D. Cal. 2010) ...............................................................................20

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ............................................................................................21

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)..............................................................................................22

*Collins v. Cargill Meat Sols. Corp.*,
  274 F.R.D. 294 (E.D. Cal. 2011) ......................................................................................13

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)................................................................................................20

*De Gonzalez v. City of Richmond*,
  No. C-14-00386 DMR, 2014 WL 2194816 (N.D. Cal. May 23, 2014).................................25

*DL v. Dist. of Columbia*,
  302 F.R.D. 1 (D.D.C. 2013)..............................................................................................16

*Green v. Am. Express Co.*,
  200 F.R.D. 211 (S.D.N.Y. 2001) ......................................................................................16

*Hanlon v. Chrysler Corp.*,
  150 F. 3d 1011 (9th Cir. 1998) ..........................................................................13, 14, 18, 21

*Harris v. Vector Mktg. Corp.*,
  No. 08-cv-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) .............................19, 20

*Helsel v. Morcom*,
  555 N.W.2d 852 (Mich. Ct. App. 1996) .............................................................................24

{00328908;13 }

ii

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*,
    No. 12-md-2320-PB, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ........................................23

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)..............................15

*In re Critical Path, Inc., Sec. Litig.*,
    No. 01-cv-00551 WHA, 2002 WL 32627559 (N.D. Cal. June 18, 2002) ..............................26

*In re Cylink Sec. Litig.*,
    274 F. Supp. 2d 1109 (N.D. Cal. 2003) ..............................................................21

*In re Elan Corp. Sec. Litig.*,
    No. 02 Civ. 865, 2002 WL 31720410 (S.D.N.Y. Dec. 3, 2002)..............................................15

*In re Heritage Bond Litig.*,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ..................19, 20, 25, 28

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ..............................................................16

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ..............................................................28

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ..............................................................27, 28

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ..............................................................18

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ..............................................................19, 27

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011)..............................................................14

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009)..............................................................14

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ..............................................................25

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ..............................................................18

*Jermyn v. Best Buy Stores, L.P.*,
    No. 08 Civ. 214 CM, 2012 WL 2505644 (S.D.N.Y. June 27, 2012)......................................17

{00328908;13 }

iii

*Johnson v. MGM Studios Inc.*, No. C17-541RSM,
   2018 U.S. Dist. LEXIS 177824 (W.D. Wash. Oct. 16, 2018) .................................................18

*Kirkorian v. Borelli*,
   695 F. Supp. 446 (N.D. Cal. 1988) ...................................................................................19

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ..............................................................................................21

*Lilly v. Jamba Juice Co.*,
   No. 13-CV-02998-JST, 2015 WL 1248027 (N.D. Cal. Mar. 18, 2015) ...........................16, 17

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ............................................................................................26

*Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) .......................................................................................22, 26

*Moore v. Verizon Commc'ns Inc.*,
   No. C 09-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013)..................................26

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ...................................................................................26, 28

*Nobles v. MBNA Corp.*,
   No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ....................................25

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) ...................................................................................19, 21, 22

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..................................................................................19, 28

*Satchell v. Fed. Express Corp.*,
   No. C03-2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007).........................................20

*United States v. Parke*,
   No. 12-cv-01787-SU, 2014 U.S. Dist. LEXIS 27448 (D. Or. Jan. 8, 2014).........................24

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ............................................................................................14

**Rules**

Fed. R. Civ. P. 23 ..............................................................................................................*passim*

**Other Authorities**

2 H. Newberg & A. Conte, *Newberg on Class Actions* (4th ed. 2002).........................................18

W. Rubenstein et al., *Newberg on Class Actions* (5th ed. 2014) ..................................................22

Restatement (Second) of Torts (1965) ........................................................................................24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>Issues to Be Decided</u>**

1) Whether the Settlement, as set forth in the Second Amended Class Action Settlement Agreement dated April 25, 2019 (ECF No. 129-1) ("Settlement Agreement"), as amended by Addendum 1 to Second Amended Class Action Settlement Agreement (ECF No. 134) (the "Addendum"), should be finally approved as fair, reasonable, and adequate.

2) Whether the Class Notice program satisfied due process and complied with Fed. R. Civ. P. 23(e).

3) Whether the Court should grant final certification to the Settlement Class.

4) Whether the Court should enter the proposed Order and Final Judgment and dismiss the Action with prejudice.

{00328908;13 }

# Introduction

Plaintiffs Scott Dodich and Jayme Gotts-Dodich; The Villas of Positano Condominium Association, Inc., on behalf of its members ("Villas"); Jill M. Barbarise; Jason Sarkis; Melissa Perez; Congshan "Sam" Hao; Bruce Garton; Sally Rogers; Deborah J. Pimentel; and Loren Morgan (collectively "Plaintiffs"), on behalf of themselves and the Settlement Class, are pleased to present, for the Court's approval, the Settlement between Plaintiffs and Defendant Niantic, Inc. ("Niantic" or "Defendant") as set forth in the Second Amended Class Action Settlement Agreement dated April 25, 2019 (ECF No. 129-1) ("Settlement Agreement"), which the Court preliminarily approved on May 2, 2019 (ECF No. 131).

Plaintiffs hereby seek an order (1) granting final approval of the proposed Settlement as set forth in the Settlement Agreement; (2) certifying the Settlement Class, as defined below, for settlement purposes only; and (3) appointing Plaintiffs as Class Representatives and their counsel as Class Counsel. This motion is based on this Memorandum of Law, the Settlement Agreement, the pleadings, orders, transcripts and other papers on file in this action, and any further evidence and arguments that may be presented at a hearing on this matter.

# Statement of Facts and Procedural History

## I.   Allegations of the Complaint

This case arises from Pokémon Go, the immensely popular game that was first launched in 2016 and is maintained and operated by Niantic. The game is centered on a world populated by exotic fictional creatures called Pokémon. Players explore that world trying to find and capture as many Pokémon as possible (indeed, the franchise's slogan is "Gotta Catch 'Em All") and then training them to fight in battles against other players' Pokémon.

Pokémon Go created an immersive "augmented reality" gaming experience in which players travel through the fictional game world not by pressing buttons on a controller but by physically exploring the real world. As the player moves in the real world, his or her avatar correspondingly moves on a map displayed on the player's phone. To capture a Pokémon, the player must move close enough to a real-world location that Niantic has designated as that Pokémon's location, and the game displays an animation of a Pokémon superimposed over the

player's camera feed, giving players the chance to "catch" a Pokémon that seems to be right in front of them. ¶¶ 23–46.[1]

This case alleges that the game actively rewards players for exploring widely and in particular for visiting different locations at different times and congregating in large groups for extended periods. There are hundreds of unique Pokémon, and the goal is to "capture them all." Different types spawn in different places (*e.g.*, some on grass, others near water) and at different times of day and night, and some are very rare, spawning only at certain times and in a narrow range of locations. ¶ 29. Niantic also designates certain real-world locations as "Pokéstops" (where players can obtain valuable in-game items) and "Pokémon gyms" (where players engage in virtual battles with other players), both of which are essential for players to advance in the game. Because each Pokéstop or Pokémon gym exists only at a specific set of GPS coordinates, a player must be physically close to the real-world property associated with those GPS coordinates to take advantage of them and reap a virtual in-game reward. ¶¶ 30–40.

However, Niantic has not limited its game board to public spaces, but instead has repeatedly placed rare Pokémon, Pokémon Gyms, or PokéStops ("Game Items") on or nearby private properties and effectively transformed those properties into scavenger hunt grounds where players can catch Pokémon, acquire useful in-game items, win battles against other Pokémon Go players, and thereby advance in the game. Plaintiffs' action alleges that this strongly encourages players to visit those locations—and to trespass if necessary to do so. ¶¶ 41–49.

Soon after Pokémon Go was launched, it became apparent that Niantic had indiscriminately placed Pokémon Game Items on private properties as well as on landmark sites, such as the National Holocaust Museum in Washington, D.C., where gameplay was highly inappropriate. The Complaint extensively detailed the experiences of putative class

---

[1] Unless otherwise indicated, all citations to ¶ _ are to the Second Consolidated Amended Class Action Complaint (ECF No. 83) (the "Complaint").

members from various states who suffered unwanted trespass and/or nuisance as a direct result of Niantic's unsolicited placement of Pokémon Game Items on or near their private properties.[2]

The Villas of Positano, a private condominium complex located in Florida, alleges on behalf of its members that hundreds of non-residents began infiltrating the Villas on a nightly basis in order to catch Pokémon during their "peak spawning hours." The players stayed for hours each night, shouting, playing music, and littering, among other disturbances. ¶¶ 52–55.

Plaintiffs Scott Dodich and Jayme Gotts-Dodich resided across the street from Wahby Park in Michigan, where Niantic had placed Pokémon Gyms and Pokéstops. The Dodichs allege that Pokémon Go players trespassed on Plaintiffs' and their neighbors' lawns, trampling their landscaping and peering into their windows, and parked their cars blocking their driveways. ¶¶ 56–58. When asked to leave, the players refused and threatened the Dodichs. ¶¶ 59–62.

Plaintiff Jason Sarkis, from New York, alleges that large groups of people began congregating at all hours of day and night around a sign at the end of his driveway, where Niantic had placed a Pokémon Gym. Large groups lingered there for weeks and often trespassed onto and damaged his property. Plaintiff "Sam" Congshan Hao, also a New York resident, alleges that he saw large groups (sometimes with more than 70 people) congregating near his house after Niantic placed a Pokéstop at a nearby intersection. The constant noise and secondhand cigarette smoke from the crowds disrupted his family's sleep and health and otherwise inflicted considerable mental distress. ¶¶ 92–96.

Plaintiff Melissa Perez alleges that Pokémon Go players trespassed onto her California property after Niantic had designated her swimming pool as a Pokéstop or a Pokémon Gym, damaging her lawn and her fence and generally causing a nuisance. ¶¶ 85–91. Similarly, Plaintiff Bruce Garton, from Tennessee, alleges that players trespassed onto his property, forcing him to chase them off, and making him and his family feel unsafe. ¶¶ 97–102.

---

[2] The named plaintiffs reside in New Jersey, Florida, Ohio, Michigan, New York, California, Tennessee and Utah.

Plaintiff Sally Rogers, from New Mexico, alleges that Pokémon Go players trespassed onto her property in pursuit of a Pokéstop on her property that resembled a "Bacon and Eggs" sculpture that had previously been on the property, but had since been removed. ¶¶ 103–17.

Plaintiff Deborah Pimentel alleges that suspected players blocked her driveway and trespassed and littered on her property because Niantic had placed a Pokémon Gym in front of her house. ¶¶ 118–23. Ohio Plaintiff Loren Morgan similarly alleges that Niantic's placement of game items near his home attracted hordes of Pokémon Go players at all hours of the night who initiated verbal altercations and who trespassed and littered onto his and his neighbor's properties. ¶¶ 124–25. New Jersey Plaintiff Jill Barbarise alleged that groups of teenage boys congregated around her property, playing Pokémon Go, and that soon thereafter, someone attempted to pull open the gate around her property, requiring repairs. ¶¶ 68–73.

The Complaint alleges that many of these Plaintiffs tried contacting Niantic to have the game items removed from their properties, but that Niantic either ignored their requests altogether, or provided a generic e-mail response that accomplished nothing.

The Complaint further alleges that the foregoing trespasses and nuisances were entirely foreseeable by Niantic when it designed and launched a game that indiscriminately placed Pokémon Game Items without confirming that the locations were not on private property, and that Niantic was indisputably on notice of the alleged transgressions no later than when Plaintiffs reported the trespasses to Niantic, yet did nothing to abate the trespass and nuisance that it knew it was causing.

## II.    Procedural History

The first complaint in the now consolidated class action was filed on July 29, 2016, just a few weeks after the release of Pokémon Go, on behalf of former Named Plaintiff Jeffrey Marder. Plaintiffs' counsel filed two additional complaints shortly thereafter, each asserting the same claims on behalf of the same class, but with different Named Plaintiffs (Jayme and Scott Dodich, and Villas). The Court later consolidated the cases before Judge James Donato under the *In re Pokémon Go Nuisance Litigation* caption. The original complaints named The

Pokémon Company and Nintendo Co., Ltd. as Defendants, but Plaintiffs later dismissed these parties voluntarily.

Plaintiffs filed an amended complaint on November 25, 2016, which Niantic moved to dismiss. At the July 27, 2017 hearing on Niantic's motion, the Court raised a question about its jurisdiction and stayed all discovery, which led Plaintiffs to amend.

Plaintiffs filed a Second Consolidated Amended Class Action Complaint on August 28, 2017, which is the current operative pleading. This Complaint also added the final eight Named Plaintiffs. The Complaint brings two claims for trespass and nuisance and seeks an injunction requiring Niantic to remove Pokémon Game Items from private properties and locations within 100 meters of private property, and barring Niantic from placing Pokémon Game Items there in the future. The action also seeks incidental monetary damages. Defendant again moved to dismiss, and the Court orally denied the Defendant's motion in its entirety at a March 29, 2018 hearing. The Court lifted the stay on discovery on March 28, 2018.

### III.    Discovery

After the Court denied the motion to dismiss in March 2018, the parties began discovery in earnest. The parties exchanged discovery requests, including requests for production of documents and interrogatories. Defendants produced over 380,000 pages of documents.  Defendant noticed depositions for each of the eleven Named Plaintiffs.  Disputes arose regarding the necessity, location and timing for these depositions.  The Parties engaged in extensive briefing regarding this dispute, as well as regarding a separate dispute concerning the Plaintiffs' responses to Defendants' interrogatory responses, which Defendant claimed were deficient.

On November 27, 2018, Plaintiff's counsel took the deposition of Niantic's Chief Product Development Officer, Kei Kawai, who was one of the key executives involved in the design and launch of Pokémon Go. Plaintiffs' counsel also noticed a Rule 30b(6) deposition of Niantic, but the case settled on the eve of this deposition.

{00328908;13 }

**IV.   Settlement Negotiations and Motion for Preliminary Approval**

The parties engaged in a full-day mediation session on November 1, 2018 in San Francisco with Gregory Lindstrom, Esq., an experienced mediator with Philips ADR. Although the parties made significant progress during this session, they did not achieve a settlement that day, but continued negotiations by telephone and email. Discovery continued while the parties negotiated. The parties agreed on a term sheet on November 28, 2018. Thereafter, the parties negotiated and drafted a formal settlement agreement and accompanying exhibits.

On February 14, 2019, Plaintiffs moved for preliminary approval of the Settlement. (ECF No. 117.) At a hearing on March 14, 2019, the Court advised the parties that the proposed Settlement needed an adequate "mechanism for handling disputes in the event the 'CRE process' is not successful for additional complaints received in the near future related to nuisance, trespass, or a request to remove a PokéStop or Gym." (ECF No. 121.) On March 28, 2019, Plaintiffs submitted a Notice of Amendment, attaching the Amended Class Action Settlement Agreement dated March 27, 2019. (ECF No. 126.) On April 11, 2019, the Court rejected the parties' proposed amendment as "vague and undefined" and granted the parties 14 days "to submit a meaningful dispute resolution mechanism, if they so choose." (ECF No. 127.)

On April 25, 2019, Plaintiffs submitted a Second Notice of Amendment (ECF No. 129), attaching the Second Amended Class Action Settlement Agreement dated April 25, 2019 (ECF No. 129-1) ("Settlement Agreement"). Pursuant to the Court's instructions, the Settlement Agreement included a specific dispute resolution procedure with specific deadlines.

**V.   Terms of the Proposed Settlement**

   A.   **Settlement Class**

The proposed Settlement Class consists of:

All persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent of such property owner or lessee, as a Pokéstop or Pokémon Gym in the Pokémon Go mobile application.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.      **Injunctive Relief**

The proposed Settlement provides injunctive relief in the form of remedial measures designed to prevent the future placement of virtual game items on private property, and to promptly address future complaints of trespass and nuisance by Pokémon Go players when they arise. Specifically, for the three-year Settlement Period, Niantic has agreed to the following:

a) For complaints properly received through Niantic's website related to nuisance, trespass, or a request to remove a PokéStop or Gym (each a "POI"), Niantic will use commercially reasonable efforts ("CRE") to resolve the complaints and communicate a resolution within no more than 15 (fifteen) days of wait time for the requestor, for 95% of cases each year.

b) In cases where the complaining party in section (a) is the owner of a single-family residential property and the party reviewing the complaint determines that the complained of POI is on or within 40 meters of that property, Niantic will instruct that reviewer to remove the POI from the property. In cases where the resolution specified in (a) or (b) requires removal of a POI, Niantic will use CRE to perform that removal within five business days of the communication from Niantic agreeing to such action.

c) Niantic will use CRE to maintain a database of complaints related to nuisance or trespass and requests to remove a POI, for a minimum of 1 (one) year from the date of the complaint. Niantic will also continue to use CRE to avoid the placement of new POI on single-family residential property.

d) Niantic will maintain a form on its website whereby an owner of single-family residential property can request that any POIs on or within 40 meters of their property be removed. In cases where Niantic has previously removed a POI from the property of a single-family residential home, and in cases where Niantic does so in the future during the settlement period, Niantic agrees to use CRE to avoid re-placing that POI on that same single-family residential property.

e) For Raids which Niantic's systems indicate will involve more than 10 participants, Niantic will use CRE to cause a warning message to appear on participants' screens before the raid begins reminding players to be

courteous to others and respectful of their real-world surroundings. Precise final language will be determined by Niantic, in its sole discretion.

f)  Niantic will add specific instructions to the current review form that Niantic's user-reviewers use to evaluate new POI submissions that direct user-reviewers to increase scrutiny regarding any proposed POI that may be located on or within 40 meters of a private single-family residential property, and POI that appear to be located in neighborhood parks. At a minimum, such instructions will include directions for the user-reviewer to examine the proposed POI using a variety of sources, including but not limited to mapping services maintained by private companies such as Google Maps. After such review, Niantic will use CRE to avoid placing the POI on any property that appears to the reviewer to be a single-family residential property.

g)  Niantic will manually review a statistically significant percentage of new POI submissions via a Niantic employee or contractor for the principal purpose of trying to avoid POIs that are more likely to lead to issues with nuisance or trespass.

h)  Niantic will maintain a mechanism for parks whereby it provides parks the opportunity to request that a specific park's Hours of Operation be applied to POIs that are located within that park. Niantic will also comply with requests related to existing POI located in parks from governmental parks authorities to apply Hours of Operation to POI located in parks within their jurisdiction. In addition to any notice of the settlement that Plaintiffs determine is required, at least once in each of the three years of the settlement period, Niantic will make a public post on its website that includes a notification that Niantic will limit the hours of operation of POIs within public parks upon request from the proper park administrator.

i)  Niantic will confirm compliance with its obligations under section (a) above by way of an audit, at Niantic's expense, conducted by an independent firm that Niantic will select, at the time of Plaintiffs' choosing during the 3 (three) year period, with at least 30 days' notice to Niantic before the commencement of the audit. Should the audit conclude that Niantic was materially non-compliant with the settlement terms in section (a) during the audited period, a second audit will be conducted, at Niantic's expense, during the settlement period, with at least 30 days' notice to Niantic before commencement of the second audit.

j)  Niantic will add a new warning to the rotating warnings that appear at the launch of the game (which currently include "do not trespass while playing Pokémon GO" and "do not play Pokémon GO while driving") that

8

states: "Be courteous to members of real-world communities as you play
Pokémon GO" or something similar.  Niantic will have the discretion to
choose the final specific language.

(Settlement Agreement ¶ 2.1.) In addition, pursuant to the Court's instructions at the March 14,
2019 hearing and the Court's April 11, 2019 Order (ECF No. 127), the Settlement Agreement
includes a "mechanism for handling disputes in the event the 'CRE process' is not successful for
additional complaints received in the near future related to nuisance, trespass, or a request to
remove a PokéStop or Gym." (ECF No. 121.) Specifically, as set forth in paragraph 8 of the
Proposed Final Judgment (ECF No. 129-5):

8.  For a period of two (2) years following the Final Settlement Date,
Plaintiffs' Counsel will be available to receive complaints from Class
Members who have already gone through Niantic's customer service
process regarding the injunctive relief specified above, in accordance
with Section 2.3 of the Settlement Agreement. Specifically, Section
2.3 of the Settlement Agreement provides that:

a.  The Long-Form Notice will provide that Class Members who
have already gone through Niantic's customer service process
may contact Plaintiffs' Counsel with complaints related to the
location of Pokéstops or Gyms in Pokémon GO, including at a
dedicated email address that Plaintiffs' Counsel will create,
such as pokemongosettlement@pomlaw.com.

b.  Within fifteen (15) business days of receiving each complaint,
Plaintiffs' Counsel will undertake a review of each complaint,
including soliciting additional information from the Class
Member where appropriate.

c.  In cases where Plaintiffs' Counsel believes Niantic should take
further action to address the Class Member's concerns,
Plaintiffs' Counsel will assemble the relevant information
bearing on the complaint, including information sufficient to
allow Niantic to locate the prior investigation of the complaint
in Niantic's systems, and Plaintiffs' Counsel's
recommendation for remediation. Plaintiffs' Counsel shall
transmit such information to Niantic, for all claims they have
chosen to raise for further review, on the first Monday of each
month (or the next business day thereafter, in the event of a
holiday).

d. Within fifteen (15) business days of receipt, Niantic will provide a written response to Plaintiffs' Counsel, including whether Niantic will offer further remediation and, if not, the basis for Niantic's position regarding the particular complaint.

e. Niantic and Plaintiffs' Counsel will make a good faith and reasonable attempt to cooperatively resolve Class Member claims that Niantic has not adhered to the terms of the Settlement.

f. Twice during this two-year period, Plaintiffs' Counsel shall file a status report with the Court, providing the Court with the number of instances where Plaintiffs' Counsel contacted for further review Niantic and a high-level summary of the nature of the complaints and resolutions.

C. **Release by Settlement Class Members**

The Settlement includes a limited release of claims for equitable and injunctive relief only. It does not include any release of claims for monetary damages. Specifically, the release discharges the Released Parties from "all claims for equitable, injunctive or declaratory relief based on the facts that were or could have been alleged in the SAC, including but not limited to injunctive claims arising out of or relating to any of the facts, transactions, events, occurrences, acts, disclosures, statements, misrepresentations, omissions, failures to act, or other conduct that was or could have been alleged, including, but not limited to, claims regarding Niantic's conduct, practices, disclosures, terms, and policies relating to the placement of POI, spawning of Pokémon , and/or design of the Pokémon GO game through the date on which the Court enters the Approval Order." The Release further waives "rights, and benefits of Section 1542 of the California Civil Code, and any law or legal principle of similar effect in any jurisdiction, whether federal or state" (*i.e.*, unknown claims).  As with the general Release, the Section 1542 release is also limited to claims for injunctive relief. *See* Section 3 of the Settlement Agreement.

VI. **Preliminary Approval and Dissemination of Notice**

On May 2, 2019, the Court entered an order preliminarily approving the Settlement and directing that notice be disseminated to the Settlement Class Members (ECF No. 131) (the

"Preliminary Approval Order"). Pursuant to the Preliminary Approval Order, the Long-Form Notice, Short-Form Notice, Complaint, Settlement Agreement, and Preliminary Approval Order were all posted on https://www.pokemongopropertysettlement.com/ (the "Class Settlement Website") on May 16, 2019. *See* Declaration of Jennifer M. Keough Regarding Settlement Administration ¶¶ 6–7. The Class Settlement Website also provides contact information for Plaintiffs' Counsel and informs Settlement Class members of the deadline to file objections and the date of the Final Approval Hearing.

The Long-Form Notice included all the information required by Rule 23(c)(2)(B) or otherwise necessary for Settlement Class Members to make an informed decision regarding the proposed Settlement, including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the terms of the Settlement, including the means for Class members who have already gone through Niantic's customer service process to contact Plaintiffs' Counsel for further review of their complaints; (iv) the parties' reasons for proposing the Settlement; (v) that Plaintiffs' Counsel would apply for an award of attorneys' fees and expenses not to exceed $4 million, and compensatory awards of up to $2,500 each for the Named Plaintiffs; (vi) how to object to the Settlement; (vii) how to contact Plaintiffs' Counsel with any questions; (viii) all relevant dates and deadlines; and (ix) the binding effect of a judgment on Settlement Class members. Keough Decl. Ex. C.

The Short-Form Notice was posted on the Pokémon GO support website on May 16, 2019 and published in the *New York Times, USA Today, and People* Magazine on May 29, 2019.[3] It was also posted in the National Recreation and Park Association eNewsletter on May 20, 2019 and in the Parks and Rec Business eNewsletter on May 31, 2019. Keough Decl. ¶¶ 4–6. The Short-Form Notice (i) defined the Settlement Class; (ii) briefly summarized the Action and the claims asserted; (iii) summarized the terms of the Settlement; (iv) specified the deadline to file objections and the date of the Final Approval Hearing; (v) emphasized the

---

[3] The Short-Form Notice was published in the June 10, 2019 issue of *People* Magazine, which went on sale on May 29, 2019.

binding effect of a judgment on Settlement Class members; and (vi) directed individuals to the Class Settlement Website for further information. Keough Decl. Exs. A, B.

The Settlement has also received considerable media coverage. *See, e.g.*, AJ Dellinger, *'Pokémon Go' settlement promises action on nuisance Pokéstops*, Engadget, Feb. 15 2019, https://www.engadget.com/2019/02/15/niantic-pokemon-go-trespassing-lawsuit-settlement/; Owen S. Good, *Pokémon Go settlement would resolve class-action trespassing claims against Niantic*, Polygon, Feb. 17, 2019 1:37pm EST, https://www.polygon.com/2019/2/17/18228436/pokemon-go-lawsuit-niantic-settlement-awards-money-legal-fees; Malcolm Owen, *Niantic agrees to change Pokemon Go locations in trespassing lawsuit settlement*, Apple Insider, Feb. 15, 2019 1:48 pm EST, https://appleinsider.com/articles/19/02/15/niantic-agrees-to-change-pokemon-go-locations-in-trespassing-lawsuit-settlement; *Pokemon Go 'trespass' legal action settled in US*, BBC, Dec. 3, 2018, https://www.bbc.com/news/technology-46426930; Paul Cotton, *Pokemon Go Lawsuit: How It Affects PokeStops & Gyms*, Dexerto.com, Feb. 17, 2019, https://www.dexerto.com/pokemon/pokemon-go-lawsuit-pokestops-gyms-372187.

As set forth in the Preliminary Approval Order and as specified on the Class Settlement Website and in the Short-Form Notice and Long-Form Notice, the deadline for Settlement Class members to submit objections is July 18, 2019. To date, no objections have been received. Keough Decl. ¶¶ 8–9.

## <u>Argument</u>

**I.    The Court Should Certify the Settlement Class
and Appoint Plaintiffs' Counsel as Class Counsel**

Class certification requires satisfying the four requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) as well as one of the three subdivisions of Rule 23(b). Here, the Settlement Class meets the requirements of Rule 23(a) as well as the requirements to certify an injunctive class under Rule 23(b)(2).

### A.    Numerosity

Numerosity is satisfied where "joinder of all [class] members is impracticable." *Hanlon v. Chrysler Corp.,* 150 F. 3d 1011, 1019 (9th Cir. 1998). Courts have routinely found the

numerosity requirement satisfied when the class comprises 40 or more members. *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011). In this action, it is undisputed that Niantic placed virtual game items on or within 100 meters of private property throughout the United States. Although there is no precise number as to how many of these game items fell on or within 100 meters of private property, public mapping information easily demonstrates that numerosity is met here.  Numerosity is satisfied.

B.    **Typicality and Commonality under Rule 23(a)**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Commonality "has been construed permissively [where] ... [t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. Typicality refers to the nature of the class representatives' claims, not to the specific facts from which they arose or the particular relief sought. Representative claims "are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* at 1020.

The Named Plaintiffs' claims are typical of, and common to the class. Plaintiffs contend that the Class claims all arise from a common course of conduct by Defendant towards each Class Member: its unauthorized placement of Pokémon Game Items on or near their properties, and its continued operation of a game that rewarded players for visiting and remaining in the vicinity of these items.

Niantic's primary defense to the claims is also common to the class. Niantic has argued that it did not encourage trespass or nuisance because its "Terms of Use" told Pokémon Go players not to trespass. Thus, as Niantic has itself framed the issue throughout this litigation, whether its conduct amounts to sufficient "encouragement" for trespass turns on whether the risk of trespass or nuisance created by its actions were outweighed by anything it did to try to prevent trespass or nuisance. Because all of this focuses on Niantic and what it did and did not do, the evidence about it is common to class members. Thus, Plaintiffs' claims arise out of the same wrongful conduct and are premised on the same legal theory as the Class claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.      **Adequacy of Representation**

Rule 23(a)(4) permits class certification if the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel. *Hanlon*, 150 F.3d at 1020.

Here, Plaintiffs have sought injunctive relief that is identical to the relief sought for the rest of the Class, in the form of a court order enjoining Niantic from placing Pokémon Go Game Items on private properties. Moreover, they have established their adequacy by securing experienced counsel to litigate their claims and secure the proposed settlement, which, if approved, will convey a substantial benefit on the Class.

The Named Plaintiffs' interests are aligned with the class; the Settlement does not afford them preferential treatment.

D.      **Class Certification is Appropriate under Rule 23(b)(2)**

Rule 23(b)(2) certification is appropriate when a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief … is appropriate," and requires no showing of superiority or predominance. A "finite proposed class period does not defeat certification of a class under Rule 23(b)(2)." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610-11 (N.D. Cal. 2009); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 669 (E.D. Mich. 2011) ("allegations which define a class period will not foreclose a claim for injunctive relief where the complaint alleges ongoing conduct").

Common issues need not predominate for plaintiffs to seek relief under Rule 23(b)(2); "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Relief may be appropriate under Rule 23(b)(2) "[e]ven if some class members have not been injured by the challenged practice." *Id*.

This case is especially suited for class wide treatment under Rule 23(b)(2). Niantic has clearly acted in a way that is "generally applicable to the class" by indiscriminately placing

{00328908;13 }

game items on private properties throughout the United States without first obtaining permission. The primary complaint by the Plaintiffs, that trespass and nuisance were caused by Niantic's placement of game items on private property, can only be remedied by Niantic changing its practices to minimize interference with private property owners' rights.  Damages are merely incidental to the injunctive relief sought. Thus, even in the absence of monetary damages, a reasonable plaintiff would still bring this action to attempt to enjoin Niantic from infringing on their property rights.

E.     **Appointment of Counsel under Rule 23(g)**

When certifying a class, the Court must also consider the appointment of class counsel. The relevant factors in deciding whether to approve a firm as class counsel are: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Plaintiffs request that Pomerantz LLP be appointed as Class Counsel. The Pomerantz Firm has been litigating complex class actions for over 80 years, and has earned many accolades from the courts for its excellent advocacy. *See In re Comverse Tech., Inc. Sec. Litig*., No. 06-CV-1825 (NGG), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) ("The court also notes that, throughout this litigation, it has been impressed by [Pomerantz LLP]'s acumen and diligence. The briefing has been thorough, clear, and convincing, and as far as the court can tell, [Pomerantz] has not taken short cuts or relaxed its efforts at any stage of the litigation."); *In re Elan Corp. Sec. Litig*., No. 02 Civ. 865 (WKFM), 2002 WL 31720410, at *5 (S.D.N.Y. Dec. 3, 2002) (appointing Pomerantz as lead counsel, noting the firm is "accomplished in the field of securities litigation and eminently qualified for this assignment.").

Moreover, Pomerantz LLP has established its adequacy in this particular case by taking on a novel and challenging case; defeating Defendant's motion to dismiss; pursuing substantial discovery; and obtaining a highly favorable outcome for the Class.

## II.   Notice to the Settlement Class Satisfied Rule 23 and Due Process

Under Rule 23(e), before approving a proposed class-action settlement, a court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see also Berry v. Schulman*, 807 F.3d 600, 612 (4th Cir. 2015) ("Rule 23(e)'s settlement approval process provides additional protection, ensuring that Rule 23(b)(2) class members receive notice of a proposed settlement and an opportunity to object"); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) ("Notice of a mandatory class settlement, which will deprive class members of their claims, therefore requires that class members be given information reasonably necessary for them to make a decision whether to object to the settlement.").

However, while Rule 23(b)(2) settlement notice must be done "in a reasonable manner," it need not satisfy the notice requirements applicable to Rule 23(b)(3) class actions, which mandate the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Accordingly, courts have typically required "less notice in Rule 23(b)(2) actions, as their outcomes do not truly bind class members." *Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2015 WL 1248027, at *8–9 (N.D. Cal. Mar. 18, 2015); *DL v. Dist. of Columbia*, 302 F.R.D. 1, 17 (D.D.C. 2013) (courts "have applied the requirement more flexibly in situations where individual notice to class members is not required, such as suits for equitable relief") (citation and quotation marks omitted), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017). In certain circumstances, courts have approved Rule 23(b)(2) settlements with no class notice at all, such as where "notice to class members would not serve the purpose of ensuring that the settlement is fair but would, in fact, jeopardize the settlement." *Green v. Am. Express Co.*, 200 F.R.D. 211, 212–13 (S.D.N.Y. 2001). The "key question in determining whether notice is required is 'whether the rights of absent class members were compromised in any way.'" *Lilly,* 2015 WL 1248027, at

1    \*8 (citation omitted); *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 CM, 2012 WL

2    2505644, at \*12 (S.D.N.Y. June 27, 2012) ("Because this injunctive settlement specifically

3    preserves and does not release the class members' monetary claims, notice to class members is

4    not required").

5         In this case, Plaintiffs' Counsel provided the Settlement Class with adequate notice of

6    the Settlement, including the remedies available to them thereunder and their opportunity to

7    object. As detailed above, the Short-Form Notice was posted on the Pokémon Go support

8    website and published in the *New York Times, USA Today, and People* Magazine. The Short-

9    Form Notice (i) defined the Settlement Class; (ii) briefly summarized the Action and the claims

10   asserted; (iii) summarized the terms of the Settlement; (iv) specified the deadline to file

11   objections and the date of the Final Approval Hearing; (v) emphasized the binding effect of a

12   judgment on Settlement Class members; and (vi) directed individuals to the Class Settlement

13   Website for further information.

14        The Long-Form Notice, Short-Form Notice, Complaint, Settlement Agreement, and

15   Preliminary Approval Order were all posted on the Class Settlement Website, along with

16   contact information for Plaintiffs' Counsel, the deadline to file objections, and the date of the

17   Final Approval Hearing. The Long-Form Notice included all the information required by Rule

18   23(c)(2)(B) or otherwise necessary for Settlement Class Members to make an informed

19   decision regarding the proposed Settlement, including: (i) an explanation of the nature of the

20   Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the terms of the

21   Settlement, including the means for Class members who have already gone through Niantic's

22   customer service process to contact Plaintiffs' Counsel for further review of their complaints;

23   (iv) the parties' reasons for proposing the Settlement; (v) that Plaintiffs' Counsel would apply

24   for an award of attorneys' fees and expenses not to exceed $4 million, and compensatory

25   awards of up to $2,500 each for the Named Plaintiffs; (vi) how to object to the Settlement; (vii)

26   how to contact Plaintiffs' Counsel with any questions; (viii) all relevant dates and deadlines;

27   and (ix) the binding effect of a judgment on Settlement Class members. It thus described "'the

28   terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate

1    and to come forward and be heard.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934,

2    946 (9th Cir. 2015) (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012)).

3           Plaintiffs believe that this Notice Program, especially in conjunction with the

4    considerable media coverage of this Action and Settlement, was sufficient to reach a

5    substantial portion of the Settlement Class. The periodicals and publications described above

6    are targeted towards the Class demographics (*i.e.*, private property owners), and have an

7    aggregate circulation of several million.

8    **III.    The Court Should Finally Approve the Settlement**

9           **A.     Standards for Judicial Approval of Class-Action Settlements**

10          Rule 23(e) "requires the district court to determine whether a proposed settlement is

11   fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026. At the same time, the

12   Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where

13   complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101

14   (9th Cir. 2008). This settlement approval process is designed to "protect the unnamed members

15   of the class from unjust or unfair settlements affecting their rights." *Id. at* 1100. Accordingly,

16   the question is "not whether the final product could be prettier, smarter or snazzier, but whether

17   it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027; *see also Carson v. Am.*

18   *Brands*, *Inc.,* 450 U.S. 79, 88 n.14 (1981) (courts should "not decide the merits of the case or

19   resolve unsettled legal questions"); 2 H. Newberg & A. Conte, *Newberg on Class Actions*

20   § 11.41 (4th ed. 2002). A court "should not second guess the settlement terms and review

21   should be 'limited to the extent necessary to reach a reasoned judgment that the agreement is

22   not the product of fraud or overreaching by, or collusion between, the negotiating parties, and

23   that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'"

24   *Johnson v. MGM Studios Inc.*, No. C17-541RSM, 2018 U.S. Dist. LEXIS 177824, at *5 (W.D.

25   Wash. Oct. 16, 2018) (quoting *Hanlon,* 150 F.3d at 1027). A settlement hearing is "not to be

26   turned into a trial or rehearsal for trial on the merits," nor should a proposed settlement "be

27   judged against a hypothetical or speculative measure of what might have been achieved by the

28

{00328908;13 }

negotiators." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

### B.  The Settlement Process Was Procedurally Fair

Courts "put a good deal of stock in the product of arms-length, non-collusive, negotiated resolution." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). This makes sense, as counsel is "most closely acquainted with the facts of the underlying litigation." *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005). Accordingly, the "recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988); *see also Harris v. Vector Mktg. Corp.*, No. 08-cv-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) ("An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining.").

Here, the proposed Settlement was reached only after extensive arms-length, informed negotiations conducted under the supervision of an experienced mediator, after over two years of hard-fought litigation. At the time of Settlement, both parties had a full understanding of the strengths and weaknesses of their respective claims and positions. Plaintiffs' Counsel had conducted an extensive investigation which produced the First and Second Amended Complaints, both of which Defendant moved to dismiss. After the court denied Defendant's motion to dismiss, the parties exchanged discovery requests and engaged in substantial discovery. Niantic produced over 380,000 pages of documents, and provided written responses to Plaintiffs' inquiries regarding Niantic's policies and procedures regarding Pokémon Go, as well as inquiries regarding the game's design. In addition, Plaintiff's Counsel took the deposition of Niantic's Chief Product Development Officer, Kei Kawai, who was one of the key executives involved in the design and launch of Pokémon Go.

{00328908;13 }

Plaintiffs' Counsel Pomerantz LLP is highly experienced in federal class actions and had a thorough understanding of the strengths and weaknesses of the parties' respective positions before agreeing to settle. Pomerantz is one of the oldest plaintiff-side securities litigation firms in the country, with decades of experience litigating class actions nationwide—including within this Circuit and District. *See* Walsh Decl. Ex. A. Throughout the litigation and settlement negotiations, Defendants were represented by very skilled and highly respected counsel at Cooley LLP. The parties' negotiations were thorough, and the Settlement was reached without collusion after good-faith bargaining. Through months of negotiations, Lead Counsel achieved a fair Settlement, taking into account the costs and risks of continued litigation. Thus, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Heritage*, 2005 WL 1594403, at *9.

The parties' settlement negotiations were supervised by an experienced mediator, which "further suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel." *Harris*, 2011 WL 1627973, at *8; *see also Chun-Hoon v. McKee Foods Corp*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *Satchell v. Fed. Express Corp*., No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). The settlement negotiations themselves were at all times hard-fought and at arms'-length, and they produced a result that the parties believe to be in their respective best interests. In connection with the mediation, the parties exchanged detailed mediation statements addressing on the risks of continuing litigation before attending an all-day mediation session with nationally regarded mediator Gregory Lindstrom, Esq. (an experienced mediator with Philips ADR).

The arms'-length nature of the settlement negotiations and the involvement of an experienced mediator supports the conclusion that the Settlement is fair and was achieved free of collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *In re Cylink Sec. Litig.*, 274 F. Supp. 2d 1109, 1112 (N.D. Cal.

1    2003) ("oversight of the settlement negotiations" by former Magistrate Judge "provides every

2    indication that those discussions were conducted at arms length").

3        **C.    The *Hanlon* Factors Confirm that the Settlement
              Is Fair, Reasonable, and Adequate**

4

5        To evaluate the substantive fairness of a settlement, courts in the Ninth Circuit consider

6    the *Hanlon* factors: "the strength of the plaintiffs' case; the risk, expense, complexity, and

7    likely duration of further litigation; the risk of maintaining class action status throughout the

8    trial; the amount offered in settlement; the extent of discovery completed and the stage of the

9    proceedings; the experience and views of counsel; the presence of a governmental participant;

10   and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026;

11   *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (referring to these as the

12   "*Hanlon* factors"). The factors are non-exclusive and not all need be shown. *Churchill Vill.,*

13   *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 n.7 (9th Cir. 2004).

14        **1.    Settlement Relief Obtained**

15        The law and public policy that favors settlements is particularly strong here where the

16   Settlement provides an immediate and tangible benefit to the Settlement Class that is well

17   within a range of reasonableness in light of the possible recoveries and the substantial risks

18   presented by the litigation.

19        The determination of a "reasonable" settlement is not susceptible to a mathematical

20   equation yielding a particularized sum. It is exceedingly difficult to compare the Settlement to

21   any theoretical amount that the Settlement Class could have potentially obtained from the

22   Defendants had it successfully defeated the motion for summary judgment, ultimately

23   established liability at trial, and fended off any appeals. Such outcomes are highly speculative,

24   and would have required years of additional efforts at high cost. Moreover, a settlement is not

25   "to be judged against a hypothetical or speculative measure of what might have been achieved

26   by the negotiators." *Officers for Justice*, 688 F.2d at 625. "Naturally, the agreement reached

27   normally embodies a compromise; in exchange for the saving of cost and elimination of risk,

28   the parties each give up something they might have won had they proceeded with litigation."

*Id.* at 624. A settlement may be acceptable even if it amounts to only a fraction of the potential recovery that might be available at trial. *See Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("there is no reason…why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

In any case, the Settlement is an excellent result for the Class and also has no "obvious substantive defects such as . . . overly broad releases of liability." William Rubenstein et al., *Newberg on Class Actions* § 13:15, at 326 (5th ed. 2014). The release of claims for equitable and injunctive relief is limited in nature and is tailored exactly to the type of relief obtained (*i.e.*, remedial measures). No class member will release claims for monetary damages as part of the Settlement. Nor does the Settlement give the Named Plaintiffs preferential treatment. Class members are free to pursue any monetary remedies against Niantic arising from the same conduct alleged here. In exchange for the limited release, and as already extensively detailed above, Niantic has agreed to be bound by substantial constraints regarding its game operations and policies that are specifically intended to prevent the future placement of game items on private property, and thus prevent future trespass and nuisance by Pokémon Go players.

For example, the Settlement directly addresses Plaintiffs' complaints that Niantic ignored complaints about its placement of game items on their properties. Niantic has agreed to make reasonable efforts to resolve and respond to complaints within 15 days (for at least 95% of cases each year). Another significant benefit for Plaintiffs is that Niantic has agreed, upon receiving a complaint/removal request from an owner of a single-family residential property, to remove the POI within 5 days of determining that such POI is on or within 40 meters of the private property.

In order to prevent the future placement of POIs on private property, Niantic has agreed to improve its review procedures for proposed POIs by having a Niantic employee or contractor manually review a statistically significant portion of proposed POI locations, with the purpose of avoiding placement of the POI on private property.

{00328908;13 }

22

In addition, Niantic has agreed to maintain a mechanism on its website for public parks to request that their normal hours of operation be applied to Pokémon Gyms and Pokéstops, to mitigate the risk of future nuisances that may be created by groups of players congregating in parks late in to the night. At least once a year for each year in the Settlement Period, Niantic will place a public posting on its website that includes a notification to parks about their ability to make this request.

Finally, the Class is further protected by the audit mechanism in the Settlement, which provides Plaintiffs' counsel with at least one audit during the Settlement Period (and a second audit if Niantic is found to be materially non-compliant with the settlement terms). Other courts have granted final approval of settlements in which defendants have agreed to change business practices to comply with the law. *See, e.g., In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12-md-2320-PB, 2015 WL 7282543, at *2, *10–13 (D.N.H. Nov. 16, 2015) (granting final approval of settlement that required the defendant to cease using allegedly misleading marketing statements, without releasing class members' monetary claims, because "[t]he proposed settlement provides a benefit equal to, or greater than, what class members would likely achieve through continued litigation").

Accordingly, the Settlement is an excellent result. The immediacy and certainty of this relief strongly supports final approval.

> 2.       **Overall Strength of Plaintiffs' Case; Risk, Expense, Complexity, and Likely Duration of Further Litigation; and Risks of Maintaining Class Action Status**

The Settlement is fair, reasonable, and adequate, particularly when viewed in light of the risks of continued litigation in this case. While Plaintiffs believe that their claims have substantial merit, this case presented novel issues of law regarding virtual trespass that have been untested in the courts, *i.e*., whether Niantic could be liable for trespass because it placed virtual game items on private property without the property owners' consent. There was no assurance that Plaintiffs would prevail in proving their claims.

1    To prevail on a claim of trespass, Plaintiffs would need to establish that Defendant

2    either trespassed itself or did "something by way of encouragement, advice, or suggestion" that

3    led Pokémon Go players to trespass onto private property. *Helsel v. Morcom*, 555 N.W.2d 852,

4    856 (Mich. Ct. App. 1996). Defendant, however, has argued that Plaintiffs would not only need

5    to show that Niantic did something to encourage trespass but also that Niantic knew that its

6    actions would "to a substantial certainty result in" trespass. Restatement (Second) of Torts

7    § 158, cmt. i–j (1965). Niantic pointed to its policies which contained admonitions to players to

8    stay off private property, as evidence that it did not, in fact, encourage or advise players to

9    commit trespass.

10    Plaintiffs also faced risks on class certification. Defendant claimed that Plaintiffs

11    conceded at the oral argument on the motion to dismiss that the placement of a virtual game

12    item on private property, standing alone, was not a trespass. The parties dispute whether such a

13    concession was ever made. However, if Plaintiffs' claims were limited in such a fashion,

14    Defendants would have argued that proving commonality would be impossible, as class

15    members would need to prove every instance of trespass/nuisance on their individual private

16    properties, creating innumerable factual divergences among the class.

17    Plaintiffs believe they have strong arguments in support of class certification,

18    particularly with respect to certification of an injunctive relief class under Rule 23(b)(2), which

19    does not require Plaintiffs to show that common issues predominate over individual ones.

20    However, Plaintiffs did face risks even in trying to obtain class-wide injunctive relief.

21    "Injunctive relief is appropriate when a party demonstrates that: (1) it has suffered an

22    irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to

23    compensate for that injury; (3) considering the balance of hardships between the plaintiff and

24    defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved

25    by a permanent injunction." *United States v. Parke*, No. 12-cv-01787-SU, 2014 U.S. Dist.

26    LEXIS 27448, at *15 (D. Or. Jan. 8, 2014) (citing *N. Cheyenne Tribe v. Norton*, 503 F.3d 836,

27    843 (9th Cir. 2007)). Defendants have argued that Plaintiffs do not have a "real or immediate"

28    threat of harm because injunctive relief requires a showing of imminent threats or harm, and

{00328908;13 }

1  the Amended Complaint does not cite any recent examples of trespass. *See De Gonzalez v. City*

2  *of Richmond*, No. C-14-00386 DMR, 2014 WL 2194816, at *4 (N.D. Cal. May 23, 2014)

3  (dismissing claim for injunctive relief where threat was neither real nor immediate). Defendant

4  also has noted that although it received many complaints of trespass in the early months after

5  the game was launched, the number of complaints has markedly decreased since then.

6  Plaintiffs believe they had a strong counterargument, that the continuing placement of game

7  items on private properties would continue to attract players to them, and thus, the threat of

8  trespass was still imminent.  However, there was no guarantee that they would prevail on this

9  issue.

10         In sum, while Plaintiffs have meritorious claims and strong arguments to support them,

11  success was not guaranteed. If the parties did not agree to settle, they would have faced an

12  expensive, time-consuming litigation process with an uncertain outcome. *See, e.g., Heritage*,

13  2005 WL 1594403, at *7 ("It is known from past experience that no matter how confident one

14  may be of the outcome of litigation, such confidence is often misplaced"); *In re Sumitomo*

15  *Copper Litig.*, 189 F.R.D. 274, 282 (S.D.N.Y. 1999) (discussing several instances where

16  settlement was rejected by a court only to have the class's ultimate recovery be less than the

17  proposed settlement). Thus, based on an exhaustive analysis of public documents as well as of

18  documents obtained in discovery, Plaintiffs and their Counsel made a reasoned strategic

19  decision to settle before risking potentially unfavorable decisions at summary judgment, trial or

20  appeals.

21         Regardless of the ultimate outcome, there is no question that further litigation against

22  the Defendants would have been expensive and complex. *See, e.g.*, *Nobles v. MBNA Corp.*, No.

23  C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) (finding a proposed

24  settlement proper "given the inherent difficulty of prevailing in class action litigation");

25  *Heritage*, 2005 WL 1594403, at *6 (class actions have a well-deserved reputation as being the

26  most complex). Accordingly, the likely duration and expense of further litigation also supports

27  a finding that the Settlement is fair, reasonable, and adequate. A more favorable outcome than

28  the current Settlement is highly uncertain at best. *See Aarons v. BMW of N. Am., LLC*, No. 11-

{00328908;13 }

cv-7667 PSG (CWx), 2014 WL 4090564, at *11 (C.D. Cal. Apr. 29, 2014) ("Aggressively litigating class certification, fending off summary judgment, and taking this case to trial would consume significant time and resources. Moreover, there is a considerable risk that Plaintiffs would come away from this case empty-handed."). After trial, any appeal would be resolved by the Ninth Circuit, one of the busiest circuit courts in the nation. Thus, the present value of certain relief now supports approval of a settlement that eliminates the expense and delay of continued litigation and the risk that the Settlement Class could receive no relief at all. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

### 3.   Extent of Discovery Completed; Stage of Proceedings

Courts have recognized that, "[t]hrough protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing." *In re Critical Path, Inc., Sec. Litig.*, No. 01-cv-00551 WHA, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002). As a result, courts regularly approve settlements reached even relatively early in the formal litigation process. *See, e.g.*, *Mego*, 213 F.3d at 459 (finding that even absent extensive formal discovery, class counsel's significant investigation and research supported settlement approval); *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *7 (N.D. Cal. Aug. 28, 2013) (settlement reached "after the parties engaged in discovery, litigated a motion to dismiss, and participated in mediation that involved an extensive exchange of information, multiple briefings, and six all-day mediation sessions" supported "the conclusion that the parties' decision to settle was a fully informed one"); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) ("In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." (citation omitted)).

In comparison, this Action was far further along by the time the Settlement was reached. As detailed above, the proposed Settlement was reached only after extensive arms-length, informed negotiations conducted under the supervision of an experienced mediator,

after over two years of hard-fought litigation. *See supra* at 19. After substantial discovery and extensive settlement negotiations, Plaintiffs and their Counsel knew the strengths and weaknesses of their case and made an informed decision to avoid the additional risk, delay, expense, and complexity of further litigation. Plaintiffs' Counsel conducted an extensive investigation while preparing the detailed Complaint, including a thorough review of voluminous media coverage; prepared and served discovery requests on Defendants; reviewed tens of thousands of pages of documents produced by Defendants; took one deposition; and fully prepared questions, documents, and logistics for another deposition. Furthermore, the multiple rounds of contested motion practice, and the months-long course of settlement negotiations gave the parties ample opportunity to present the strengths of their respective cases and to hear one another's perspectives. As a result, Plaintiffs' Counsel was thoroughly familiar with the facts and had ample opportunity to assess the strengths and weaknesses of the claims so as to negotiate and evaluate the Settlement before more time or resources were expended on further litigation with the Defendants.

### 4.      Experienced Counsel Negotiated the Settlement in Good Faith and at Arm's-Length and Believe It Is Fair, Reasonable, and Adequate

As detailed above (*see supra* at 19), Plaintiffs' Counsel's informed determination that the Settlement is in the best interest of the Settlement Class should be afforded significant weight. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters.*, 47 F.3d at 378. Plaintiffs' Counsel Pomerantz LLP is highly experienced in class actions and had a thorough understanding of the strengths and weaknesses of the parties' respective positions before agreeing to settle. Pomerantz is one of the oldest plaintiff-side securities litigation firms in the country, with decades of experience litigating class actions nationwide— including within this Circuit and District. *See* Walsh Decl. Ex. A. Throughout the litigation and settlement negotiations, Defendants were represented by very skilled and highly respected counsel at Cooley LLP. The parties' negotiations were thorough, and the Settlement was reached without collusion after good-faith bargaining among the parties. Through months of

{00328908;13 }

negotiations, Lead Counsel achieved a fair Settlement, taking into account the costs and risks of continued litigation. Thus, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Heritage*, 2005 WL 1594403, at *9.

### 5.   The Absence of a Governmental Participant

There was no governmental participant litigating on behalf of or alongside the Plaintiffs in this Action. Without this private civil action, there would have been no relief for the Settlement Class.[4] Accordingly, this factor supports approval of the Settlement. *See Rodriguez*, 563 F.3d at 966.

### 6.   The Positive Reaction of the Settlement Class

As set forth in the Preliminary Approval Order and as specified on the Class Settlement Website and in the Short-Form Notice and Long-Form Notice, the deadline for Settlement Class members to submit objections is July 18, 2019. To date, no Settlement Class member has objected to the Settlement or any aspect thereof.[5] Keough Decl. ¶¶ 8–9. This favorable reaction by the Settlement Class further supports the fairness and adequacy of the Settlement. *See Omnivision*, 559 F. Supp. 2d at 1043; *Nat'l Rural Telecomms.*, 221 F.R.D. at 529 ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

---

[4] In fact, many governmental efforts to address land-use problems arising out of augmented-reality games have been less successful than this Action. *See, e.g., Candy Lab Inc. v. Milwaukee Cty.*, 266 F. Supp. 3d 1139 (E.D. Wis. 2017) (enjoining, on First Amendment grounds, county ordinance requiring operators of location-based augmented-reality games to obtain event permits and secure garbage collection, security, medical services, and insurance before such games could be played in county parks).

[5] Consistent with *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988, 994 (9th Cir. 2010), which requires counsel's fee motion to be filed before the deadline for objections to afford class members the opportunity "thoroughly to examine counsel's fee motion," the deadline for filing any objections is July 18, 2019.

{00328908;13 }

1

## <u>Conclusion</u>

2

3

For all the foregoing reasons, the Settlement should be granted final approval; the

Settlement Class should be certified for settlement purposes; the Named Plaintiffs (Scott

4

Dodich and Jayme Gotts-Dodich; The Villas of Positano Condominium Association, Inc.; Jill

5

M. Barbarise; Jason Sarkis; Melissa Perez; Congshan "Sam" Hao; Bruce Garton; Sally Rogers;

6

Deborah J. Pimentel; and Loren Morgan) should be appointed as class representatives; and

7

Pomerantz LLP should be appointed Class Counsel.

8

Dated: June 13, 2019                                 Respectfully submitted,

9

**POMERANTZ LLP**

10

11

*/s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman

12

Murielle J. Steven Walsh
Aatif Iqbal

13

600 Third Avenue
20th Floor

14

New York, NY 10016
Phone: 212-661-1100

15

Fax: 917-463-1044
Email: jalieberman@pomlaw.com

16

mjsteven @pomlaw..com
aiqbal@pomlaw.com

17

18

**POMERANTZ LLP**
Patrick V. Dahlstrom

19

Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603

20

Phone: 312-377-1181
Fax: 312-229-8811

21

Email: pdahlstrom@pomlaw.com

22

23

**POMERANTZ LLP**
Jennifer Pafiti (SB # 282790)

24

1100 Glendon Avenue
Los Angeles, CA 90024

25

Phone: 310-405-7190
Email: jpafiti@pomlaw.com

26

27

***Counsel for Plaintiffs***

28

{00328908;13 }