UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE POKÉMON GO NUISANCE LITIGATION** | Case No. 3:16-cv-04300-JD<br><br>**DECLARATION OF JENNIFER M. KEOUGH REGARDING SETTLEMENT ADMINISTRATION** |

I, JENNIFER M. KEOUGH, declare and state as follows:

    1.    I am the Chief Executive Officer of JND Legal Administration LLC ("JND"). JND is a legal administration services provider with its headquarters located in Seattle, Washington. JND has extensive experience with all aspects of legal administration and has administered settlements in hundreds of class action cases.

    2.    JND is serving as the administrator in the above-captioned litigation ("Action") for the purposes of administering the Settlement Agreement preliminarily approved by the Court in its Order Granting Preliminary Approval of Settlement and Directing Notice to Settlement Class, dated May 2, 2019. The following statements are based on my personal knowledge and information provided to me by other JND employees working under my supervision, and if called on to do so, I could and would testify competently thereto.

3. JND is one of the leading legal administration firms in the country, and the principals of JND, including myself, collectively have over 75 years of experience in class action legal and administrative fields. JND's class action division provides all services necessary for the effective implementation of class action settlements including: (1) all facets of legal notice, such as outbound mailing, email notification, and the design and implementation of media programs, including through digital and social media platforms; (2) website design and deployment, including online claim filing capabilities; (3) call center and other contact support; (4) secure class member data management; (5) paper and electronic claims processing; (6) calculation design and programming; (7) payment disbursements through check, wire, PayPal, merchandise credits, and other means; (8) qualified settlement fund tax reporting; (9) banking services and reporting; and (10) all other functions related to the secure and accurate administration of class action settlements. JND has been recognized by various publications, including the National Law Journal and the Legal Times, and most recently, the New York Law Journal, for excellence in class action administration.

## PUBLICATION NOTICE

4. On May 29, 2019, JND caused a publication version of the Short-Form Notice ("Publication Notice") to appear in *The New York Times* and *USA Today*. JND also caused the Publication Notice to appear in the June 10, 2019 issue of *People* magazine, which became available to readers on May 31, 2019. A copy of the Publication Notice, as it appeared in each of the publications, is attached hereto as **Exhibit A**.

5. On May 20, 2019, JND caused a digital version of the notice ("Digital Notice") to appear in the National Recreation and Park Association (NRPA) eNewsletter and again on May 31, 2019 in the Parks and Rec Business (PRB) eNewsletter. In addition, from May 20, 2019 through June 2, 2019, JND caused the Digital Notice to appear in rotation with other digital ads on both NRPA's (www.nrpa.org) and PRB's (www.parksandrecbusiness.com) websites. A screenshot of the Digital Notice and the tearsheets, as they appeared in the publications, are attached hereto as **Exhibit B**.

## WEBSITE

6. On May 16, 2019, JND established a Class Settlement Website, www.pokemongopropertysettlement.com, to provide additional information to the Class Members and answer frequently asked questions. Viewers of the website can download a copy of the Long-Form Notice and the Settlement Agreement, as well as other case-related documents. The Long-Form Notice is attached hereto as **Exhibit C**.

7. As of the date of this Declaration, the Settlement website tracked 186 unique visitors and 861 page-views.

## OBJECTIONS

8. The Notice informed Class Members that any Class Member who wants to object to the approval of the Settlement has to submit a written statement with the Clerk of the Court, submitted on or before July 18, 2019.

9. As of the date of this Declaration, JND has not received and is not aware of any objections to the proposed Settlement.

I declare under the penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed on June 13, 2019 at Seattle, Washington.

By: _____
JENNIFER M. KEOUGH

# EXHIBIT A

Case 3:16-cv-04300-JD   Document 138   Filed 06/13/19   Page 4 of 17

# LEGAL NOTICE
# NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

**Attention: all persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent, as a Pokémon Gym or Pokéstop in the *Pokémon Go* mobile app.**

**READ THIS NOTICE AND INSTRUCTIONS CAREFULLY. A CLASS ACTION LAWSUIT MAY AFFECT YOUR LEGAL RIGHTS.**

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

A proposed settlement has been reached in a class action lawsuit about the location-based mobile game *Pokémon Go*, styled *In re Pokémon Go Nuisance Litigation*, Case No. 3:16-cv-04300-JD (N.D. Cal.). The lawsuit alleges that Niantic, Inc. ("Niantic"), the developer of *Pokémon Go*, violated state trespass and nuisance laws by placing game items called "Pokémon Gyms" and "PokéStops" on or near privately-owned property without prior permission and by enticing and/or causing *Pokémon Go* players to trespass upon such properties and/or interfere with property owners' use and enjoyment of such properties. Niantic denies any and all wrongdoing or legal violation. The settlement, if approved by the Court, will resolve the lawsuit by requiring Niantic to follow a series of procedures intended to minimize interference with the rights of private property owners, including (1) maintaining a straightforward complaint process for complaints about alleged trespass or nuisance by Pokémon Go players, (2) removal upon request of any Pokémon Gym or Pokéstop located on or within 40 meters of single-family residential property, and (3) a commitment to honor requests for limited hours of operation for Pokémon Gyms and Pokéstops in parks.

*The settlement does not provide any monetary relief, and it will not affect any claim for monetary relief that you may otherwise have against Niantic.*

For more information, please visit the settlement website at **www.pokemongopropertysettlement.com**, where you can find a more detailed Notice with information about (1) the Settlement and the injunctive relief it provides; (2) Class Counsel's request for attorneys' fees and costs; and (3) the procedures for objecting to the Settlement or request for attorneys' fees, as well as the Settlement Agreement.

The Court will hold a Final Approval Hearing on August 22, 2019 at 10:00 AM to decide whether to approve the settlement. If you are a Class member and the Settlement is approved by the Court, **you cannot opt out from the Settlement** and you will be bound by the release of injunctive and equitable claims. If you wish to object to the Settlement, you must do so no later than July 18, 2019 and in accordance with the procedures outlined in the Notice.

**PLEASE DO NOT CONTACT THE COURT, THE COURT CLERK'S OFFICE, OR NIANTIC'S COUNSEL WITH QUESTIONS ABOUT THIS SETTLEMENT**.

Any questions must be directed to Class Counsel: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY 10016, www.pomlaw.com, (212) 661-1100.

# EXHIBIT B

 

# Trade War's Next Front Against China May Be Wall St.

FROM FIRST BUSINESS PAGE

cans," Mr. Bannon said. "It's outrageous. All of it should be shut down immediately."

Adding fuel to the discussion, Alibaba, the Chinese e-commerce giant that held a hugely successful initial public offering in New York five years ago, is now considering also listing its shares in the semi-autonomous Chinese city of Hong Kong, according to a person familiar with the matter. The person, who asked for anonymity because the discussions were not public, said the move was not under consideration because of geopolitical worries.

As the United States ramps up other trade barriers, the outlook for the financial sector on both sides of the Pacific is starting to change, part of a broader decoupling between the two economies.

"There are growing calls on the U.S. side for complete decoupling, which is causing Chinese enterprises to re-evaluate their reliance not just on U.S. technology but also on other U.S. resources, including financial markets," said Andy Mok, a senior fellow at the Center for China and Globalization, a research group in Beijing.

China has long considered Wall Street an ally.

In the late 1990s, Beijing appealed to financial executives to lobby the Clinton administration to allow it to join the World Trade Organization, the club of nations that sets global trade rules. Executives of major firms like Goldman Sachs and the Blackstone Group often meet with Chinese leaders. They have also acted as go-betweens, counseling Trump administration officials on how the trade war is being received in China and on Wall Street.

Big banks see the fast-growing country as an important source of business, even if they have largely been blocked from competing in China's tightly controlled financial system. Chinese companies have raised tens of billions of dollars through American financial markets in recent years. Wall Street banks have earned big fees from advising Chinese businesses on initial public offerings and on acquisitions of American businesses and real estate.



Jack Ma, the Alibaba co-founder, at the New York Stock Exchange in 2014 as the company made its trading debut. TODD HEISLER/THE NEW YORK TIMES

"China is full of amazing entrepreneurs whom we look forward to welcoming," said Robert H. McCooey Jr., a senior vice president of listing services at Nasdaq.

The Trump administration hasn't announced any moves to cut off China, and Chinese companies continue to enjoy access to American markets.

But skepticism is growing among some administration officials and legislators about the presence of Chinese companies on American capital markets and in major stock indexes.

In a letter in April, a bipartisan group of senators, including Marco Rubio, Republican of Florida, urged the administration to increase disclosure requirements for Chinese companies listed in the United States that pose national security risks or are complicit in human rights abuses.

The letter named HikVision, which the Trump administration is considering blocking from buying American components over its role in the surveillance and mass detention of Uighurs, a mostly Muslim ethnic minority. HikVision is a component of MSCI stock indexes, and its investors have included UBS, J. P. Morgan, and the public pension funds of teachers in California and New York.

"Americans would likely be very troubled, if not outraged, to learn that their retirement and other investment dollars are funding Chinese companies with links to the Chinese government's security apparatus and malevolent behavior," the letter read.

It's not clear how much credence such ideas have with the president and his current advisers. But if Washington did act, China has its own way to strike back.

Chinese entities, mainly the country's central bank and sovereign wealth fund, own at least $200 billion in shares in the United States, by one estimate, giving Beijing a possible additional weapon should Chinese leaders decide to sell. China's economic policymakers are aware of that extreme option, people familiar with the policymaking said. They insisted on anonymity because of the political and diplomatic sensitivity of the issue.

Such a move could shake the American stock market, which Mr. Trump considers a barometer of his success. For many years, policymakers, economists and bankers have asked what might happen to the American economy should China suddenly dump much of the $1.3 trillion it holds in United States debt.

Selling stocks could be more potent than paring back bonds. Stock markets tend to respond to smaller sums of money than American government bonds do because the market for Treasury bills is simply so big.

China is unlikely to dump shares quickly, said Mark Sobel, a former Treasury official who is now the United States chairman of the London-based Official Monetary and Financial Institutions Forum. Doing so not only would upset the United States but also could mean selling shares at a loss during a temporary dip in prices, which would hurt the investment return on China's assets.

"In my experience, China's reserve managers have always acted in a professional manner and sought to promote financial stability," he wrote in an email.

In the past, Chinese government agencies have quietly and gradually sold part of their American stock holdings when they have needed extra dollars to help manage the value of the currency, said Brad Setser, an economist at the Council on Foreign Relations in New York.

Chinese firms that start changing their relationship with American financial markets now face questions over whether their moves are trade related.

The Shanghai-based Semiconductor Manufacturing International Corporation, a computer chip maker traded mostly in Hong Kong, is shifting the trading of its American depositary shares from the New York Stock Exchange to the far less visible over-the-counter market. S.M.I.C., as it is known, attributed the decision to low trading volume in its shares in New York.

"S.M.I.C. has been considering this migration for a long time, and it has nothing to do with the trade war" or with the trans-Pacific dispute over Huawei, a Chinese tech company, S.M.I.C. said in a statement in response to questions.

Alibaba has long discussed selling its shares in mainland China or Hong Kong, so it is not clear what role, if any, the trade war had in its considerations. Jack Ma, the co-founder of Alibaba, said at a conference last year that he would consider whether to do another stock listing in Hong Kong.

For Alibaba, a Hong Kong share sale could allow more Chinese investors to put their money in a company that many of them use in their daily lives. Alibaba's stepped-up discussions over listing in Hong Kong were reported earlier by Bloomberg.

With the trade war going on, Mr. Mok, at the Beijing research group, said Chinese companies were now more likely to think twice about depending on American financial markets. "There is no desire on the Chinese side for decoupling," he said, "but it is maybe a prudent management decision to reduce risk exposure."

*Keith Bradsher reported from Beijing, and Ana Swanson from Washington. Edward Wong contributed reporting from Washington, and Paul Mozur from Shanghai.*

# Lynch to Join Paul Weiss As Partner In New York

FROM FIRST BUSINESS PAGE

feel like New York has the most diverse and legal environment in the country if not the world."

Brad Karp, the law firm's chairman, was in Ms. Lynch's graduating class at Harvard Law School.

"Loretta is one of the most highly regarded lawyers in the country, with a unique background and a unique set of experiences," he said. "She is collegial and collaborative."

Between her two stints as United States attorney, Ms. Lynch was a partner with the law firm Hogan & Hartson. She has served on the board of the Federal Reserve Bank of New York and was the special counsel to the international tribunal that prosecuted those responsible for human rights violations and genocide in Rwanda in the early 1990s.

As the top federal prosecutor in Brooklyn, Ms. Lynch oversaw a number of high-profile public corruption cases, as well as the investigation that led to the filing of bribery charges against officials with FIFA, the international soccer organization.

As attorney general, she issued a report that found the Chicago Police Department relied too heavily on deadly force. She was an advocate for making it easier for felons to re-enter society.

But her nearly two-year tenure was partly defined by her department's handling of investigations into Hillary Clinton's use of a private email server.

In June 2016, with the presidential campaign in full swing, former President Clinton boarded Ms. Lynch's Justice Department plane on the tarmac in Phoenix. When the visit became public, it raised questions about her ability to oversee the investigation in an impartial manner. A report from the department's inspector general later found that the brief meeting



As a former attorney general, Loretta Lynch, 60, was an attractive job candidate for many law firms.

"was an error in judgment." Ms. Lynch has said she viewed it as purely social.

As a former attorney general, Ms. Lynch, 60, was an attractive job candidate for many law firms. She was also coveted in an industry that has faced intensifying criticism for its lack of racial and gender diversity.

A recent report by the New York City Bar Association faulted top law firms for the "slow ascension to leadership and elevated attrition rates for attorneys of color and women." The report found that after years of steady progress, the recruitment and advancement of minorities at big law firms had stagnated and even regressed.

Paul Weiss has a better record on that front than most big law firms. The nonprofit group Lawyers of Color found this year that Paul Weiss had the highest percentage of black lawyers — 8 percent — of the 400 firms it ranked.

But Paul Weiss has not been immune to criticism. This year, when the firm posted a photo on LinkedIn of a dozen new partners — all but one of them white men — it set off outrage on social media.

Ms. Lynch said Paul Weiss was a leader in focusing on diversity and took a "holistic approach to providing equal opportunity through the ranks." She said that was important because at big law firms there was a tendency for "a lot of women and minority to move on to other professions."

Since leaving office, she has taken a muted tone to criticizing the Trump administration. Delivering the commencement address at the Hofstra University Law School last week, she said the nation's commitment to reason and the rule of law "now falls under daily attack from those we once trusted to uphold them." By contrast, her immediate predecessor as attorney general, Eric H. Holder Jr., recently blasted Attorney General William Barr as being "not fit" to lead the Justice Department.

Ms. Lynch said she would rather stick to commenting on policy disagreements. She said in the interview that she was concerned that the Justice Department was backing away from its commitment to civil rights, especially when it comes to dealing with community policing.

*Other points of view on the Op-Ed page seven days a week. The New York Times*

# Oklahoma and Johnson & Johnson Trade Barbs in Opioid Trial

**By JAN HOFFMAN**

Opening statements in the country's first trial over whether a pharmaceutical company is liable for the opioid crisis began as a battle between fire and ice: Lawyers for Oklahoma, a state brought to its knees by addiction and overdose deaths, heatedly accused Johnson & Johnson of creating a deadly demand for the drugs, while the company coolly responded that it had acted responsibly and lawfully in its quest to offer relief to chronic pain patients.

The trial, heard by a judge without a jury but livestreamed to the public, is being closely watched not only by those affected by prescription opioid addiction, but also by lawyers in almost 1,900 similar federal and state cases nationwide. Two other defendants with manufacture opioids settled with Oklahoma — Purdue Pharma will pay $270 million, Teva Pharmaceuticals, $85 million — leaving only J & J on trial.

The state directly confronted what many legal experts have predicted will be the highest hurdle in the case: connecting one manufacturer of opioids to the cascading harms wrought by the entire industry.

J & J pushed back hard, arguing that the state itself looked the other way as its own drug review board and prescription monitoring program for years neglected to swoop down on sources of diverted opioids. In addition, it said, Oklahoma could not tie any death directly to the company's products: Duragesic, a fentanyl patch, and Nucynta, an opioid pill it no longer makes.

"You hear about pill mills," said Larry D. Ottaway, the lead counsel for a J & J subsidiary, Janssen Pharmaceuticals. "You don't hear about patch mills."

Both sides introduced what are sure to be their signature earworms, themes that will be echoed throughout the trial, estimated to take about two months.

"If you oversupply, people will die," said Brad Beckworth, representing the Oklahoma attorney general's office. He repeated the phrase to drive home the state's argument that J & J sent squads of salespeople to persuade physicians of the broad utility of its fentanyl patch, indicated specifically for cancer breakthrough pain.

In doing so, said Mr. Beckworth, J & J persuaded doctors to "start with and stay with" medications intended only as a last resort.

Through greed and deceptive marketing, he said, J & J aggressively competed with Purdue Pharma, which used a similar approach for OxyContin. And he



Brad Beckworth, representing Oklahoma, made opening statements Tuesday. POOL PHOTO BY CHRIS LANDSBERGER

quoted the lyrics of what he said was his sister's favorite song from the musical "Annie Get Your Gun": "Anything You Can Do (I Can Do Better)."

In getting around what J & J raised as a defense — that its market share of the drugs was minuscule — Mr. Beckworth cited the company's promotional materials, which praised the benefits of opioids generally. Essentially, he was arguing that by presenting opioids as safe and useful, J & J was liable for the harms created by all brands, not just its own.

"Everywhere in the decision tree about prescribing or taking an opioid," Mr. Beckworth said, "J & J was there first."

Another significant hurdle for the state is its legal theory: that J & J created a "public nuisance," which it will have to abate. Legal experts have said such a tactic is risky. A lawyer for the state, Mike Burrage, argued that Oklahoma's public nuisance law includes interference with the public's health and safety rights. As for J & J's assertion that such laws typically cover property, Mr. Burrage said that the harm accrued from the company's behavior did occur on property: "in doctors' offices, in pharmacies, homes. In schools, universities, parks."

The state's lawyers, including the attorney general, Mike Hunter, laid out their case for nearly two hours.

J & J has a reputation for being willing to withstand numerous rounds of trials before agreeing to settle. In that spirit, Mr. Ottaway jumped right in. Eschewing the conventional break between each side's statements, he grabbed five minutes before lunch to begin damage control. He threw down what will most likely be the defense's own earworm, made famous in 1770 by John Adams in his defense of British soldiers involved in the Boston Massacre: "Facts are stubborn things."

In 2009, when J & J's promotional materials said that opioids "rarely caused addiction," the Food and Drug Administration made virtually the same assertion, he said. And to push back against Mr. Beckworth's insistence that the company marketed opioids to children, Mr. Ottaway played a four-minute video, created by the defendants and a school nursing association for high school students, that bluntly described the many dangers of prescription opioids.

The company's defense appears to be multipronged: that each drug meticulously took a decade to develop; that the company and federal regulators continued to monitor the drugs after launch; that the state, through licensing doctors and pharmacists, had its own oversight responsibility; and that the company's goal all along was to aid millions of patients with chronic pain.

When the drugs, approved by federal agencies, were used as indicated by warning labels and according to a provider's instructions, he said, they did not result in addiction and death. He pointed to Oklahoma's own regulations, which he said had looser controls over OxyContin than J & J's products, despite mounting evidence showing that much of the diversion and addiction-related problems were connected to Purdue's product, not J & J's.

**LEGAL NOTICE**

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

**Attention:** all persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent, as a Pokémon Gym or Pokéstop in the *Pokémon Go* mobile app.

**READ THIS NOTICE AND INSTRUCTIONS CAREFULLY.
A CLASS ACTION LAWSUIT MAY AFFECT YOUR LEGAL RIGHTS.**

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

A proposed settlement has been reached in a class action lawsuit about the location-based mobile game *Pokémon Go*, styled *In re Pokémon Go Nuisance Litigation*, Case No. 3:16-cv-04300-JD (N.D. Cal.). The lawsuit alleges that Niantic, Inc. ("Niantic"), the developer of *Pokémon Go*, violated state trespass and nuisance laws by placing game items called "Pokémon Gyms" and "PokéStops" on or near privately-owned property without prior permission and by enticing and/or causing *Pokémon Go* players to trespass upon such properties and/or interfere with property owners' use and enjoyment of such properties. Niantic denies any and all wrongdoing or legal violation. The settlement, if approved by the Court, will resolve the lawsuit by requiring Niantic to follow a series of procedures intended to minimize interference with the rights of private property owners, including (1) maintaining a straightforward complaint process for complaints about alleged trespass or nuisance by Pokémon Go players, (2) removal upon request of any Pokémon Gym or Pokéstop located on or within 40 meters of single-family residential property, and (3) a commitment to honor requests for limited hours of operation for Pokémon Gyms and Pokéstops in parks.

*The settlement does not provide any monetary relief, and it will not affect any claim for monetary relief that you may otherwise have against Niantic.*

For more information, please visit the settlement website at **www.pokemongopropertysettlement.com**, where you can find a more detailed Notice with information about (1) the Settlement and the injunctive relief it provides; (2) Class Counsel's request for attorneys' fees and costs; and (3) the procedures for objecting to the Settlement or request for attorneys' fees, as well as the Settlement Agreement.

The Court will hold a Final Approval Hearing on August 22, 2019 at 10:00 AM to decide whether to approve the settlement. If you are a Class member and the Settlement is approved by the Court, **you cannot opt out from the Settlement** and you will be bound by the release of injunctive and equitable claims. If you wish to object to the Settlement, you must do so no later than July 18, 2019 and in accordance with the procedures outlined in the Notice.

**PLEASE DO NOT CONTACT THE COURT, THE COURT CLERK'S OFFICE, OR NIANTIC'S COUNSEL WITH QUESTIONS ABOUT THIS SETTLEMENT.**

Any questions must be directed to Class Counsel: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY 10016, **www.pomlaw.com**, (212) 661-1100.

**COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES**

OFFICE SPACE (100)
Offices–Manhattan 105
5th+Lex Offices, Showrooms, Retail
B/r GRAND CENTRAL & PENN STA.
185 Mad., 353 Lex., 385 5th,
390 5th, 5 W 37th
620 SF to 8,620 SF
Owner Management
212-843-5400  Floor Plans on Website
www.HilsonManagement.com

INVESTMENT PROPERTIES (600)
Investment Properties
Other Areas 605
WESTERN CATSKILLS, NY
Income Producing Residential
Triplex. 3 hours NYC. $125,000. Owner.
For more information Catskills
Triplex, Box 41, Beaverville, NY 12809

## TELEVISION

# Starstruck 'Voice' champ Jarmon is flying high

**Cydney Henderson**
USA TODAY

Maelyn Jarmon is on cloud nine – pastel-colored clouds, to be exact.

The Texas native, 26, was named the Season 16 champ of "The Voice" during last week's finale, giving John Legend his first win as a coach.

Meeting pop star Taylor Swift was the cherry on top.

"She literally just posted about me on Instagram and I'm freaking out!" Jarmon told USA TODAY Wednesday, referring to a picture of the two singers that Swift shared with her 118 million followers. (No big deal!)

"A huge congratulations to @maelynmusic!! Meeting you made my day," Swift captioned a duck-face selfie of the pair on Instagram after her finale performance of "Me!" with Brendon Urie.

And, it's safe to say Swift made Jarmon's entire week: "She was such a dream and she was excited to meet me. I'm



"Voice" coach John Legend celebrates with Maelyn Jarmon. TRAE PATTON/NBC

like, 'What! Are you kidding me?' "

The moment was just one of many as Jarmon celebrated winning the NBC singing competition after successfully taking down Team Blake Shelton's Gyth Rigdon, Dexter Roberts and Andrew Sevener.

"I was absolutely intimidated. That was a lot of country boys to go up against," Jarmon says. Despite being the most streamed "Voice" artist on Apple Music two weeks in a row, she says she had "zero expectations" coming into the finale.

Jarmon first caught the coaches' eyes during her Blind Audition, as the first four-chair-turn of the season, where she revealed that she is deaf in one ear. Instead of looking at her hearing impairment as a weakness, the "Voice" champ believes it's her "little superpower" that helped her win the competition.

"People consider it a disability ... but it is something that makes you unique and different," she says. "It's all about your mind-set. If you choose to not make it a disability, you can actually make it an advantage."

That's exactly what Jarmon did with her flawless pitch and uncanny ability to inject raw emotion into her songs.

"I sing off the way I feel and what I'm hearing in the vibrations," she says.

Jarmon lost hearing in her right ear at age 2 following multiple reconstructive surgeries after tubes meant to treat recurring ear infections damaged her eardrum. She has only 80% hearing in her left ear.

"I had a long time to adjust to it, but oddly enough, it helps me hear music in a very different way, and I feel music as much as I hear it," she said. "Yes, there are struggles with it, but ... it makes success that much sweeter."

As for the family dinner Legend promised Jarmon during a news conference after the finale?

"Now that it's over... we will definitely talk about getting together," she says. "I'm just so happy that we've gotten to work together already that whatever else happens is just gravy."

## MARKETPLACE TODAY
For advertising information: 1.800.397.0070   www.russelljohns.com/usat

### NOTICES
### LEGAL NOTICE
### LEGAL NOTICE

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

Attention: all persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent, as a Pokémon Gym or Pokéstop in the *Pokémon Go* mobile app.

**READ THIS NOTICE AND INSTRUCTIONS CAREFULLY. A CLASS ACTION LAWSUIT MAY AFFECT YOUR LEGAL RIGHTS.**

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

A proposed settlement has been reached in a class action lawsuit about the location-based mobile game *Pokémon Go*, styled *In re Pokémon Go Nuisance Litigation*, Case No. 3:16-cv-04300-JD (N.D. Cal.). The lawsuit alleges that Niantic, Inc. ("Niantic"), the developer of *Pokémon Go*, violated state trespass and nuisance laws by placing game items called "Pokémon Gyms" and "PokéStops" on or near privately-owned property without prior permission and by enticing and/or causing *Pokémon Go* players to trespass upon such properties and/or interfere with property owners' use and enjoyment of such properties. Niantic denies any and all wrongdoing or legal violation. The settlement, if approved by the Court, will resolve the lawsuit by requiring Niantic to follow a series of procedures intended to minimize interference with the rights of private property owners, including (1) maintaining a straightforward complaint process for complaints about alleged trespass or nuisance by Pokémon Go players, (2) removal upon request of any Pokémon Gym or Pokéstop located on or within 40 meters of single-family residential property, and (3) a commitment to honor requests for limited hours of operation for Pokémon Gyms and Pokéstops in parks.

*The settlement does not provide any monetary relief, and it will not affect any claim for monetary relief that you may otherwise have against Niantic.*

For more information, please visit the settlement website at **www.pokemongopropertysettlement.com**, where you can find a more detailed Notice with information about (1) the Settlement and the injunctive relief it provides; (2) Class Counsel's request for attorneys' fees and costs; and (3) the procedures for objecting to the Settlement or request for attorneys' fees, as well as the Settlement Agreement.

The Court will hold a Final Approval Hearing on August 22, 2019 at 10:00 AM to decide whether to approve the settlement. If you are a Class member and the Settlement is approved by the Court, **you cannot opt out from the Settlement** and you will be bound by the release of injunctive and equitable claims. If you wish to object to the Settlement, you must do so no later than July 18, 2019 and in accordance with the procedures outlined in the Notice.

**PLEASE DO NOT CONTACT THE COURT, THE COURT CLERK'S OFFICE, OR NIANTIC'S COUNSEL WITH QUESTIONS ABOUT THIS SETTLEMENT.**

Any questions must be directed to Class Counsel: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY 10016, www.pomlaw.com, (212) 661-1100.

---

# Williams
Continued from Page 1D

**Question: What were your favorite horror movies growing up?**

*Allison Williams:* I tried to avoid the genre because I'm very easily scared. At slumber parties growing up, I watched "The Exorcist" and "Poltergeist." And then right around "Get Out," I went through another wave of watching a ton of thrillers like "The Shining," "Rosemary's Baby," etc. Now I can say it's a genre that I love, but it was never something I pictured myself being part of. It really wasn't until I read the script for "Get Out" that I started thinking of psychological thrillers as a genre in which some of the most interesting characters exist.

**Q: Did you play any musical instruments as a kid?**

*Williams:* I played piano for quite a while, loved it and wish I'd kept it up. It was definitely helpful to have a musical background for music-reading purposes (in this movie), but the cello is such a difficult instrument. There are no frets, so you never really know where you are on the neck. They start you learning by putting pieces of tape there so you can remember where the notes are, but because we were playing prodigies, the tape was gone. So we had to just remember where everything was. Your posture, the way you hold the bow – all of it is so much harder than you think because the idea is that it



Chris (Daniel Kaluuya) gets in deep with his girlfriend's (Williams) family in "Get Out." JUSTIN LUBIN/UNIVERSAL STUDIOS

looks painless and effortless and beautiful and sensual. Deep down, it's just deeply difficult.

**Q: Is there anything that you're a perfectionist about?**

*Williams:* Well, when I was younger, I used to redo my homework to make it look perfect, especially math homework. I would actually do the problems, work it all out and it would be messy with eraser. Then I'd get a fresh piece of graph paper and redo all of it – showing my work still, but just very neatly. That's time I'll never get back.

**Q: Do you still get stopped by strangers who recognize you from "Get Out?"**

*Williams:* Yes, I now have a whole other set of interactions with people who've seen "Get Out" that are very interesting. The odd thing about "Get Out" is that the interaction has a slight panic to it because they are both interested in talking to me about the movie but slightly scared of me at the same time.

**Q: What have been some of the most memorable interactions?**

*Williams:* Oh, I've been asked to hold keys in a photo. I've been asked to look scary while they make a scared face. I've had some interesting TSA interactions at the airport – all kinds of things.

**Q: Do your friends or family treat you any differently?**

*Williams:* After the trailer for "The Perfection" came out, a couple of people close to me just sort of looked at me and were like, "What is going on? Why are you always playing someone that we know is tricking us in some way?" They all started thinking, "Is that happening in real life? What is this about you and are you in therapy working through this? Because we need to make sure that we're all safe." But luckily they all understand that I'm an actor and this is what I do for a living.

---

# Rocketman
Continued from Page 1D

"Saturday Night's Alright (for Fighting)" and a spirited, literally uplifting performance of "Crocodile Rock." Fletcher even makes the passing-time montage stylish, as Egerton belts out "Pinball Wizard" in a dizzying cavalcade of crazy costumes that change as his piano spins. (Whatever they spent to re-create the Englishman's wacky wardrobe, it was worth every pound.)

Some numbers seem much too staid in comparison, yet the quiet ones land, too, as with Elton working out the melody of "Your Song" for a grinning Taupin. If Rami Malek's Freddie Mercury was good enough for an Academy Award, then Egerton might as well get an Oscar and a Rock and Roll Hall of Fame induction ceremony. He deftly handles Elton's rollercoaster feelings, flipping from seething fury to wide-eyed happiness when he walks on a



Taron Egerton portrays (and sings) Elton John in the musical biopic "Rocketman." DAVID APPLEBY

stage. And there are no lip-synced notes here: Egerton not only sings all of John's most famous tunes but also makes them his own, at least for two hours.

One of the themes of "Rocketman" is John's yearning for real love, romantic and parental, and that includes exploring his homosexuality – his coming out to Bernie (and his friend's immediate acceptance) stands in stark contrast to his mother's reaction and Reid's encouragement to stay in the closet. The film is never dour, but there is a definite melancholic aspect that balances the musician's showy persona.

John's gifts are his songs, and with "Rocketman," his wonderful life gets a worthy, refreshing big-screen treatment.



CLASSIFIEDS

**ONE CALL DOES IT ALL!**
Call Today! (800) 397-0070
Your Ad in Print, Online Classifieds, & Internet Banners Too!



# Stop juggling it all yourself!



### Cozi is the #1 family organizing app

- With one shared calendar, everyone adds events and sees who's doing what
- Cozi will notify others and send reminders— so you don't have to
- Share the grocery list, chores and meal plan
- Easy to use from any mobile device, tablet or computer

## Get Cozi today – free in the app store.

 

© 2018 Cozi Inc. Cozi is a registered trademark of Cozi Inc.

## LEGAL NOTICE

### NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

**Attention: all persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent, as a Pokémon Gym or Pokéstop in the *Pokémon Go* mobile app.**

READ THIS NOTICE AND INSTRUCTIONS CAREFULLY. A CLASS ACTION LAWSUIT MAY AFFECT YOUR LEGAL RIGHTS.

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

A proposed settlement has been reached in a class action lawsuit about the location-based mobile game *Pokémon Go*, styled *In re Pokémon Go Nuisance Litigation*, Case No. 3:16-cv-04300-JD (N.D. Cal.). The lawsuit alleges that Niantic, Inc. ("Niantic"), the developer of *Pokémon Go*, violated state trespass and nuisance laws by placing game items called "Pokémon Gyms" and "PokéStops" on or near privately-owned property without prior permission and by enticing and/or causing *Pokémon Go* players to trespass upon such properties and/or interfere with property owners' use and enjoyment of such properties. Niantic denies any and all wrongdoing or legal violation. The settlement, if approved by the Court, will resolve the lawsuit by requiring Niantic to follow a series of procedures intended to minimize interference with the rights of private property owners, including (1) maintaining a straightforward complaint process for complaints about alleged trespass or nuisance by Pokémon Go players, (2) removal upon request of any Pokémon Gym or Pokéstop located on or within 40 meters of single-family residential property, and (3) a commitment to honor requests for limited hours of operation for Pokémon Gyms and Pokéstops in parks.

*The settlement does not provide any monetary relief, and it will not affect any claim for monetary relief that you may otherwise have against Niantic.*

For more information, please visit the settlement website at **www.pokemongopropertysettlement.com**, where you can find a more detailed Notice with information about (1) the Settlement and the injunctive relief it provides; (2) Class Counsel's request for attorneys' fees and costs; and (3) the procedures for objecting to the Settlement or request for attorneys' fees, as well as the Settlement Agreement.

The Court will hold a Final Approval Hearing on August 22, 2019 at 10:00 AM to decide whether to approve the settlement. If you are a Class member and the Settlement is approved by the Court, **you cannot opt out from the Settlement** and you will be bound by the release of injunctive and equitable claims. If you wish to object to the Settlement, you must do so no later than July 18, 2019 and in accordance with the procedures outlined in the Notice.

**PLEASE DO NOT CONTACT THE COURT, THE COURT CLERK'S OFFICE, OR NIANTIC'S COUNSEL WITH QUESTIONS ABOUT THIS SETTLEMENT.**

Any questions must be directed to Class Counsel: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY 10016, www.pomlaw.com, (212) 661-1100.

# EXHIBIT C

## NOTICE OF PROPOSED CLASS-ACTION SETTLEMENT

**Attention: all persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent, as a Pokémon gym or Pokéstop in the *Pokémon Go* mobile app.**

**READ THIS NOTICE AND INSTRUCTIONS CAREFULLY. A CLASS ACTION LAWSUIT MAY AFFECT YOUR LEGAL RIGHTS.**

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

A proposed settlement has been reached in a class action lawsuit about the location-based mobile game *Pokémon Go*, styled *In re Pokemon Go Nuisance Litigation*, Case No. 3:16-cv-04300-JD (N.D. Cal.). The lawsuit alleges that Niantic, Inc. ("Niantic"), the developer of *Pokémon Go*, violated state trespass and nuisance laws by placing game items called "Pokémon Gyms" and "PokéStops" on or near privately-owned property without prior permission and by enticing and/or causing *Pokémon Go* players to trespass upon such properties and/or interfere with property owners' use and enjoyment of such properties. Niantic denies any and all wrongdoing or legal violation. The settlement, if approved by the Court, will resolve the lawsuit by requiring Niantic to follow a series of procedures, detailed below, intended to minimize interference with the rights of private property owners.

*The settlement does not provide any monetary relief, and it will not affect any claim for monetary relief that you may otherwise have against Niantic.*

If you are a Class member and the Settlement is approved by the Court, you cannot opt out from the settlement and you will be bound by the release of injunctive and equitable claims. If you wish to object to the settlement, you must do so by following the procedures outlined below.

### Class Definition

Solely for purposes of effectuating this settlement, Judge James Donato of the United States District Court for the Northern District of California has conditionally certified a Settlement Class for injunctive relief of:

> All persons in the United States who own or lease property within 100 meters of any location that Niantic has designated, without prior consent of such property owner or lessee, as a Pokéstop or Pokémon Gym in the *Pokémon Go* mobile application.

### Summary of the Proposed Settlement

The settlement provides only injunctive (non-monetary) relief to the Class. If approved by the Court, it will require Niantic to follow a series of procedures outlined below.

{00323274;4 }

Specifically, for at least **the next three years**, Niantic has agreed to the following in connection with *Pokémon Go* in the United States:

1. **A straightforward complaint process for complaints about alleged trespass or nuisance by Pokémon Go players:**

    a. Niantic will maintain a form on its website at https://pokemongolive.com/en/report-location (or a similar URL) where you can submit complaints to Niantic relating to any alleged interference with your private property rights by people you believe to be *Pokémon Go* players, and where you can request that Niantic remove from the *Pokémon Go* game any Pokémon Gym or Pokéstop located near your property that you believe may be related to such alleged interference.

    b. For complaints properly submitted to Niantic through the form listed above relating to nuisance or trespass or a request to remove a Pokéstop or Pokémon Gym, Niantic will use commercially reasonable efforts to resolve the complaints and communicate a resolution within no more than 15 days of wait time for the requestor, for 95% of cases each year.

    c. Niantic will agree to confirm compliance with these obligations by way of an audit, at Niantic's expense, conducted by an independent firm that Niantic will select. Should the audit conclude that Niantic was materially non-compliant with the settlement terms) during the audited period, a second audit will be conducted, at Niantic's expense, after 30 days' notice.

    d. For complaints where the resolution requires the removal of a Pokémon Gym or Pokéstop from the *Pokémon Go* game, Niantic will use commercially reasonable efforts to perform that removal within five business days of the communication from Niantic agreeing to such action.

2. **Removal of any Pokémon Gym or Pokéstop located on or within 40 meters of single-family residential property:**

    a. Using the form on Niantic's website listed above, you can request that any Pokémon Gym or Pokéstop located on or within 40 meters of your single-family residential property be removed from the *Pokémon Go* game. You can make this request regardless of whether you have experienced any specific interference with your private property rights by people you believe to be *Pokémon Go* players.

    b. If Niantic determines that the complained-of Pokéstop or Pokémon Gym is on or within 40 meters of your property, Niantic will use commercially reasonable efforts to perform that removal within five business days of the communication from Niantic agreeing to such action.

{00323274;4 }

3. **Niantic will maintain a database of complaints so as to avoid problems recurring in the future:**

    a. Niantic will use commercially reasonable efforts to maintain a database of complaints related to nuisance or trespass and requests to remove a Pokémon Gym or Pokéstop, for a minimum of 1 (one) year from the date of the complaint.

    b. Where Niantic has previously removed a Pokémon Gym or Pokéstop from a single-family residential property, and in cases where Niantic does so in the future during the settlement period, Niantic will use commercially reasonable efforts to avoid replacing that Pokémon Gym or Pokéstop on that same single-family residential property.

4. **Niantic will honor requests for limited hours of operation for Pokémon Gyms and Pokéstops in parks:**

    a. Niantic will maintain a form on its website where public parks can request that the Hours of Operation of a specific park be applied to any Pokémon Gym or Pokéstop located within that park. Government parks authorities can also use this form to request that the "Hours of Operation" of each park within their jurisdiction be applied to any Pokémon Gyms and Pokéstops located within each park.

    b. At least once a year, Niantic will make a public post on its website reminding parks that Niantic has agreed to limit the hours of operation of Pokémon Gyms and Pokéstops within public parks upon request from the proper park administrator.

5. **Additional reminders to *Pokémon Go* players to be respectful of private property:**

    a. Niantic will add a new warning to the rotating warnings that appear at the launch of the game (which currently include "do not trespass while playing Pokémon GO" and "do not play Pokémon GO while driving") that states: "Be courteous to members of real-world communities as you play Pokémon GO" or similar.

    b. For Raids which Niantic's systems indicate will involve more than 10 participants, Niantic will use commercially reasonable efforts to cause a warning message to appear on participants' screens before the raid begins reminding players to be courteous to others and respectful of their real-world surroundings.

6. **Additional safeguards to avoid placing new Pokémon Gyms or Pokéstops in locations that are likely to lead to issues with nuisance or trespass:**

    a. Niantic will add specific instructions to the current review form that Niantic's user-reviewers use to evaluate new locations nominated to become Pokémon Gyms or Pokéstops that direct user-reviewers to increase scrutiny regarding any proposed locations that may be on or within 40 meters of a private single-family residential property or that appear to be in neighborhood parks. (For more

> information about Niantic's process for evaluating new locations for Pokéstops, see https://niantic.helpshift.com/a/pokemon-go/?l=en&p=web&s=pokestops&f=what-makes-a-high-quality-pokestop.) At a minimum, such instructions will include directions for the user-reviewer to examine the proposed new location using a variety of sources, including but not limited to mapping services maintained by private companies, such as Google Maps.
>
> b. After such review, Niantic will use commercially reasonable efforts to avoid placing a new Pokémon Gym or Pokéstop on any property that appears to the reviewer to be a single-family residential property.
>
> c. Niantic will manually review a statistically significant percentage of new locations nominated to become Pokémon Gyms or Pokéstops via a Niantic employee or contractor for the principal purpose of trying to avoid placing new Pokémon Gyms or Pokéstops in locations that are more likely to lead to issues with nuisance or trespass.

7. **Class Counsel available to assist with further disputes:**

    a. For a period of two years after the Court approves the settlement, Class Members who have already gone through Niantic's customer service process can contact Class Counsel using the information provided below or at pokemongosettlement@pomlaw.com with any issues they experience with the processes outlined in this section.

## Attorneys' Fees

The attorneys at Pomerantz LLP, who represent the Class ("Class Counsel"), intend to seek $4 million in attorneys' fees and expenses for their work on the case. These amounts, to the extent awarded by the Court, will be paid by Defendant separate and apart from the other relief provided by the settlement. Class Counsel also intend to request service awards of $2,500 for each of the eleven named plaintiffs who will serve as class representatives for their time and effort working on this case for the benefit of the Class. Class Counsels' motion for attorneys' fees and costs will be available after **June 13, 2019** by visiting www.pokemongopropertysettlement.com or by contacting Class Counsel (contact information below).

## Effect of the Settlement on the Rights of Class Members

If the Settlement is approved by the Court, all Class Members will release and forever discharge claims for injunctive or equitable relief that were or could have had been brought against Niantic arising out of *Pokémon Go*, the design of *Pokémon Go,* or the locations of Pokémon, Pokéstops, or Pokémon Gyms in *Pokémon Go*.

{00323274;4 }

**The Settlement will only release claims for equitable or injunctive relief; it will not release any rights any Class Member may otherwise have to sue Niantic for money damages.**

**Class members cannot opt out from the Settlement**. If you are a Class member and the Settlement is approved by the Court, you will be bound by the release of injunctive and/or equitable claims. In other words, if you want to preserve your right to sue Niantic individually on similar grounds in the future, you must object to the Settlement as described below.

### How to Comment on or Object to the Settlement

You have the right to file an objection to the settlement. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, the proposed settlement will not take effect and the lawsuit will continue. If that is what you want to happen, you must object.

Any objection to the proposed settlement must be in writing and sent only to the Court. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number (*In re Pokemon Go Nuisance Litigation*, Case Number 3:16-cv-04300-JD), (b) be submitted to the Court either by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, 450 Golden Gate Avenue, Box 36060, San Francisco, CA 94102-3489, or by filing them in person at any location of the United States District Court for the Northern District of California, (c) state with specificity the grounds for the comment or objection, (d) state whether the comment or objection applies only to the commentor or objector, to a specific subset of the class, or to the entire class; and (e) be postmarked no later than **July 18, 2019**.

### Final Approval Hearing

The District Court will hold a Final Approval Hearing to decide whether to approve the settlement. The Final Approval Hearing will be held on **August 22, 2019 at 10:00 a.m.** at the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate. If there are objections or requests to be heard, the Court may consider them at the hearing. The Court may also decide the amount of attorneys' fees and costs to be paid to Class Counsel.

The date of the Final Approval Hearing may change without further notice to the class. You should check the settlement website at http://www.pokemongopropertysettlement.com to get the most current information concerning the date of the hearing. You may also access the Court's docket in this case, for a fee, through the Court's Public Access to Court Electronic Records ("PACER") system at https://ecf.cand.uscourts.gov/cgi-bin/DktRpt.pl?301537.

## Further Information

This notice summarizes the proposed settlement. For the precise terms and conditions of the settlement, please see the Settlement Agreement available at http://www.pokemongopropertysettlement.com by contacting Class Counsel via the contact information provided below, by accessing the Court's docket through the PACER system at the URL provided above, or by visiting the office of the Clerk for the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, CA 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

To obtain a copy of this notice in alternate accessible formats, contact Class Counsel.

**PLEASE DO NOT CONTACT THE COURT, THE COURT CLERK'S OFFICE, OR NIANTIC'S COUNSEL WITH QUESTIONS ABOUT THIS SETTLEMENT**.

Any questions must be directed to Class Counsel at **(212) 661-1100** or the address below:

> Pomerantz LLP
> 600 Third Avenue, 20th Floor
> New York, New York 10016
> www.pomlaw.com